595 So.2d 624 (1992)
José E. LIMA and Andrea K. Lima
v.
Jonathan R. SCHMIDT.
No. 91-C-1848.
Supreme Court of Louisiana.
March 2, 1992.
*626 John Dale Powers, Powers, Vaughn & Clegg, Baton Rouge, for applicant.
W. Paul Anderson, Leake & Anderson, New Orleans, for respondent.
HALL, Justice.
Plaintiffs filed this malpractice action against defendant attorney in November 1988, alleging that defendant, who represented them in a real estate transaction in June 1983, was negligent in failing to inform them of the existence of a $150,000 collateral mortgage encumbering the property that they acquired in the transaction and in failing to have that mortgage cancelled, which failure resulted in the mortgagee foreclosing upon the property in July 1985 and the property being sold at sheriff's sale in June 1987. The district court sustained defendant's exception of prescription and dismissed plaintiffs' suit. On plaintiffs' appeal, the court of appeal, in an unpublished opinion, affirmed, 583 So.2d 1244. We granted plaintiffs' application for writs, 589 So.2d 484 (La.1991), and now reverse and remand.

I.
The pleadings and exhibits in the record disclose the following facts. Plaintiffs, José and Andrea Lima, retained defendant attorney, Jonathan Schmidt, to handle an exchange transaction. On July 25, 1983, the Limas executed a power of attorney, appointing Schmidt as their agent and attorney-in-fact to execute the Act of Exchange and any other documents necessary to effectuate the exchange. While Schmidt billed the Limas for closing costs, which included a $700 title examination fee, no formal title opinion or report was rendered.
On July 29, 1983, the exchange transaction was closed with Schmidt signing the Act of Exchange on the Limas' behalf. Pursuant to the Act of Exchange, the Limas transferred various tracts of land and, in return, received a tract of land. The Limas also executed a $12,000 note secured by the property they acquired. While the Act of Exchange expressly provided for the assumption of various mortgages on the properties the Limas transferred, the Act contained no reference to any mortgages on the property the Limas acquired. Indeed, *627 the Limas allege in their petition that it was their intent, and that Schmidt expressly represented to them, that they would acquire the property free and clear of all encumbrances other than the $12,000 note executed by them. Nonetheless, on the date of the exchange, allegedly unbeknownst to the Limas, the property was encumbered by a $150,000 collateral mortgage in favor of First Guaranty Bank of Hammond ("Bank").
In July 1985, Bank commenced an executory proceeding pursuant to which the Limas were served with notice of seizure. Upon receiving notice, the Limas contacted Schmidt, who advised them that he would take steps to cancel the encumbrance. Thereafter, Schmidt discussed with the Limas steps that would be taken in an attempt to clear the title to the property. Also, on the Limas behalf, Schmidt hired and paid another attorney to defend the foreclosure suit. The defense proved unsuccessful, and on June 25, 1987, the property was sold at sheriff's sale for $30,191.19 to Bank. Thereafter, the Limas retained independent counsel.
On August 14, 1987, Schmidt wrote the Limas, advising them that he was negotiating the purchase of the property from Bank and attempting to secure the return of their $12,000 note. Schmidt further stated that his intent was to put the Limas "back in the original position which [they] were entitled."
On August 25, 1987, the Limas' counsel wrote Schmidt, responding that Schmidt's offer of "settlement" set forth in his August 14th letter was unsatisfactory. Additional correspondence followed.
On January 8, 1988, Schmidt wrote the Limas' counsel, advising that from the outset his intent was "the return of the Limas to the same position they would have enjoyed had the collateral been properly substituted and the property conveyed as originally intended." Schmidt again advised of his efforts to reacquire the property from Bank and to satisfy the outstanding note. Schmidt also stated that he had advised the Limas to seek other advice to explore any claim they have or had against him because of the "obvious error and omission." Schmidt also posed an alternative offer: that he transfer to the Limas another piece of property having a superior location, timber and development potential, and on January 20, 1988, Schmidt wrote the Limas' counsel enclosing a copy of the plat of the alternative property.
The Limas filed suit for damages resulting from Schmidt's professional malpractice in November 1988, more than five years after the alleged act of malpractice; more than three years after the commencement of Bank's foreclosure proceeding and the Limas admitted knowledge of the alleged malpractice; and more than a year after the foreclosure sale, the Limas' employment of another attorney, and Schmidt's August 14th letter advising the Limas of his intention to make them whole; but less than a year after Schmidt's January 8th letter reaffirming his intent to make the Limas whole. In their petition, the Limas allege that Schmidt failed to inform them of Bank's superior mortgage and failed to have that mortgage cancelled, and pray for $110,000 in damages as a result of being deprived of the ownership, enjoyment, use, fruits and revenues of the property.
Schmidt filed an exception of prescription, which the trial court sustained without oral or written reasons. The court of appeal, in an unpublished opinion, affirmed. Relying on Rayne State Bank & Trust Co. v. National Union Fire Insurance Co., 483 So.2d 987 (La.1986), the court of appeal found that the Limas sustained damage sufficient to state a cause of action against Schmidt in July 1985, when, by virtue of the notice of seizure, they obtained knowledge of Bank's mortgage. As the Limas' petition on its face revealed that prescription had run, the court of appeal found that the Limas had the burden of proving prescription was interrupted or renounced. Interruption, the court of appeal reasoned, could have occurred only during the one year from July 1985 to 1986, as once prescription has accrued, it cannot be interrupted. The court of appeal found the record devoid of any evidence of an acknowledgment *628 sufficient to interrupt prescription; none of the correspondence between Schmidt and the Limas and their attorney was sent during the relevant period, nor did the Limas offer any evidence of acts or statements by Schmidt during that period that could have served as an acknowledgment. The court of appeal likewise concluded that the correspondence from Schmidt, which the Limas relied upon to support a renunciation failed to evidence the requisite intent to renounce, reasoning:
The correspondence illustrates a relationship between an attorney (Schmidt) and his former clients (Limas) whereby the attorney attempts to resolve an undesired result, but for which he admits no personal legal culpability. The language is clear that Schmidt felt that an error and omission was made and that he was willing to make an effort to correct it. However, we find no admission by Schmidt that the error was his or that an agreement between him and the Limas had been reached regarding method or measure of resolution. We certainly find no intent, either express or tacit, to renounce the benefits of prescription which has accrued.
Thus, the court of appeal found that the Limas' claim prescribed in July 1986, one year after prescription began to run. For the reasons that follow, we find that the Limas' claim has not prescribed, and reverse and remand.

II.
As a general rule, an action for legal malpractice is a delictual action governed by the one-year prescription of LSA-C.C. Art. 3492.[1]Braud v. New England Insurance Co., 576 So.2d 466 (La.1991); Rayne State Bank & Trust Co. v. National Union Fire Insurance Co., 483 So.2d 987 (La.1986). While this rule is subject to certain limited exceptions,[2] an examination of the pleadings filed in this case reveals that the parties do not dispute that this action is governed by the one-year period set forth in LSA-C.C. Art. 3492. Nor do the parties dispute, as found by the court of appeal, that prescription commenced to run [absent suspension as discussed later in this opinion] in July 1985, when the Limas obtained actual knowledge of Bank's mortgage by virtue of the notice of seizure.[3]
When, as in the instant case, the plaintiff's petition on its face reveals that prescription has run, the burden is on the plaintiff to show why the claim has not prescribed. See Bock v. Harmon, 526 So.2d 292 (La.App. 3rd Cir.), writ denied, 531 So.2d 275 (La.1988); Emery v. Cabral, 400 So.2d 340 (La.App. 4th Cir.), writ denied, 405 So.2d 533 (La.1981); Andrus v. Patton, 394 So.2d 714 (La.App. 3rd Cir. 1981) (collecting cases); See also Sun Oil Co. v. Tarver, 219 La. 103, 52 So.2d 437 (1951) (setting forth as well-settled rule that party relying upon interruption or suspension of prescription bears burden of proof). The jurisprudence has recognized three theories upon which a plaintiff may rely to establish that prescription has not run: suspension, interruption and renunciation.
*629 In support of the contention that their claim has not prescribed, the Limas rely upon all three theories. Suspension applies, the Limas argue, because during Schmidt's continued representation of them prescription was suspended, or did not commence to run, under contra non valentem principles, at least until June 1987, when the property was sold at sheriff's sale and they retained independent counsel. The Limas concede, however, that since their suit was not filed until November 1988, their claim would have prescribed absent a subsequent interruption or renunciation. Continuing, the Limas argue that a subsequent interruption occurred when Schmidt acknowledged, tacitly or expressly, their right, particularly evidenced in his August 14, 1987, and January 8, 1988, letters. Alternatively, they argue that if prescription accrued, it was subsequently renounced by Schmidt.
Conversely, Schmidt, supported by the court of appeal, contends that the Limas' claim prescribed one year after it commenced to run; hence, as prescription commenced in July 1985, when the Limas received notice of seizure, the Limas' claim prescribed in July 1986. Schmidt argues, alternatively, that if prescription was suspended by his continued representation to June 1987, it accrued one year thereafter in June 1988. Schmidt further argues, again supported by the court of appeal, that the record evidence is insufficient to support either an acknowledgment sufficient to interrupt prescription or a renunciation of prescription. Schmidt characterizes his letters as mere offers to settle a disputed claim and his actions as simple humanitarian gestures, and contends that he neither acknowledged liability, nor the Limas' right to recover damages. He further contends that in his January 8th letter, he did not admit that the "obvious error and omission" was his.

III.
At the outset, we observe that prescriptive statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus, of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted. Foster v. Breaux, 263 La. 1112, 270 So.2d 526 (1972); Knecht v. Board of Trustees for Colleges and Universities, 525 So.2d 250 (La.App. 1st Cir.), writ denied, 530 So.2d 87 (La. 1988); Odessa House v. Goss, 453 So.2d 299 (La.App. 3rd Cir.1984). To soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem non currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc. and Touche Ross & Co., 593 So.2d 351 (La. 1992); Plaquemines Parish Comm'n Council v. Delta Development Co., Inc., 502 So.2d 1034, 1054 (La.1987); Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (1970). In Plaquemines Parish, supra, we observed that application of contra non valentem principles to claims arising out of the fiduciary attorney-client relationship has been considered in two Louisiana appellate cases: Elzy v. ABC Insurance Co., 472 So.2d 205, 208 (La.App. 4th Cir.), writ denied, 475 So.2d 361 (La.1985); and Jackson v. Zito, 314 So.2d 401 (La.App. 1st Cir.), writ denied, 320 So.2d 551, 553 (La.1975), overruled in part on other grounds, Cherokee Restaurant, Inc. v. Pierson, 428 So.2d 995, 999 (La.App. 1st Cir.1983).
In Elzy, supra, the Fourth Circuit noted that contra non valentem "may well be applicable where a lawyer has concealed his fault from the client or has otherwise prevented the client from bringing suit." 472 So.2d at 208. Similarly, in Jackson, supra, the First Circuit noted that "an attorney who remains silent when prescription has run against his client would, in light of his fiduciary duty to said client, be guilty of an act which effectually prevented the client from availing himself of his action against said attorney." 314 So.2d at 406-7. Applying these principles, in Plaquemines Parish, supra, we found that the continuous representation of plaintiffs by the defendants in their fiduciary roles as not only public officials, but also attorneys, *630 coupled with other factors, warranted application of the contra non valentem exception.
More recently, in Brand v. New England Insurance Co., 576 So.2d 466 (La. 1991), we recognized that prescription will be suspended "during the attorney's continuous representation of the client regarding the specific subject matter in which the alleged wrongful act or omission occurred." Id. at 468 (collecting cases). This suspension principle is based on the third application of contra non valentem, which suspends prescription when the debtor has done some act effectually to prevent the creditor from availing himself of his cause of action. Blanchard v. Reeves, 469 So.2d 1165, 1168 (La.App. 5th Cir.), writ denied, 476 So.2d 347 (La.1985).
This suspension principle, labeled the "continuous representation rule," has been recognized by a host of Louisiana appellate decisions and has been widely recognized in other jurisdictions. See Annot., 32 A.L.R. 4th 260 (1984). "[T]he continuous representation rule appropriately protects the integrity of the attorney-client relationship and affords the attorney an opportunity to remedy his error (or to establish that there has been no error), while simultaneously preventing the attorney from defeating the client's cause of action through delay." Wall v. Lewis, 393 N.W.2d 758, 763 (N.D. 1986). The rationale behind this rule is that "[a] plaintiff cannot justly be held to be `sleeping on his rights' when he is relying upon a honored fiduciary relationship." Note, Civil ProcedureStatute of Limitations Accrual in Attorney Malpractice Actions: Thorpe v. DeMent, 20 Wake Forest L.Rev. 1017, 1038 (1984). Indeed, to hold to the contrary "would require a client to hire a backup lawyer to continually review the work of the primary lawyer." Gill v. Warren, 751 S.W.2d 33 (Ky.App.1988); See also Olivier v. National Union Fire Insurance Co., 499 So.2d 1330, 1337 (La.App. 3rd Cir.1986) (contrary holding would allow attorney to defeat malpractice claim by using appeal process to continue relationship until prescription has run).
This rule is especially apt in the context of "an ongoing, continuous, developing and dependent relationship between the client and attorney, with the latter seeking to rectify an alleged act of malpractice." Peduto v. Durr, 97 App.Div.2d 959, 468 N.Y.S.2d 953, 955 (4th Dept.1983). This is such a case.
Having found this suspension principle applicable in the instant case, we must address the more difficult question of when the relationship terminated. As noted, the Limas contend that the attorney-client relationship did not terminate until June 1987, when the property was sold and they retained independent counsel. More particularly, they contend that Schmidt's hiring of another attorney to defend the foreclosure suit and Schmidt's continuing to provide them with advice constituted continuous representation. We agree.
The issue of when the attorney-client relationship terminates for purposes of accrual of prescription was addressed by the First Circuit in Succession of Smith v. Kavanaugh, Pierson & Talley, 565 So.2d 990 (La.App. 1st Cir.), writ denied, 567 So.2d 1125 (La.1990). There, the First Circuit, borrowing from the South Dakota Supreme Court's decision in Schoenrock v. Tappe, 419 N.W.2d 197 (S.D.1988), aptly stated that the continuous representation rule should apply only "where the professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship." 565 So.2d at 995. In pinpointing when the relationship terminated, the First Circuit noted that the entire relationship between the attorney and client must be examined. Id.
Termination is not synonymous with a change of counsel, but rather "on-going contacts involving advice or service can constitute representation." Mallen and Smith, Legal Malpractice, § 18.12, p. 121 (3d Ed.1989). For instance, in Wall v. Lewis, 393 N.W.2d 758 (N.D.1986), the North Dakota Supreme Court held that the relationship did not terminate as a matter of law when the defendant-attorney took the *631 bench as judge and hired another attorney to represent the plaintiff-clients. While not resolving the continuous representation issue (the court found insufficient evidence in the record to decide the issue on summary judgment), the court in Wall, supra, provides some insight on how it would have resolved this issue, indicating that the determinative factor is the extent or quality of the defendant's contacts with the plaintiffs after hiring another attorney and whether those contacts evidence legal advice or services. 393 N.W.2d at 764.
Applying these principles here, we find that Schmidt clearly continued to represent the Limas until June, or at the latest August, 1987. More specifically, we find Schmidt's contacts with the Limas, which included discussions regarding steps to attempt to clear title to the property, evidence legal advice or services. Thus, we find that Schmidt's representation was continued by his hiring and paying for another attorney to defend the foreclosure suit, which was not concluded until June 1987. In any event, at the latest, by August 1987, the Limas had retained independent counsel, who represented them adversely to Schmidt. Thus, under contra non valentem principles, prescription was suspended, or did not commence to run, until June or August 1987. As the Limas concede, however, more than a year elapsed between the termination of the attorney-client relationship in June or August 1987 and the Limas commencement of the instant action in November 1988. Thus, the Limas claim has prescribed unless prescription was either interrupted or renounced.

IV.
Prescription that has commenced to accrue, but has not yet run, may be interrupted. "Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe." LSA-C.C. Art. 3464. "If prescription is interrupted, the time that has run is not counted. Prescription commences to run anew from the last day of interruption." LSA-C.C. Art. 3466.
"Prescription may be renounced only after it has accrued." LSA-C.C. Art. 3449. "Renunciation may be express or tacit. Tacit renunciation results from circumstances that give rise to a presumption that the advantages of prescription have been abandoned." LSA-C.C. Art. 3450.
Acknowledgment and renunciation differ in both substance and legal effect. Substantively, acknowledgment is the recognition of the creditor's right or obligation that halts the progress of prescription before it has run its course; renunciation is the technical term designating the abandonment of rights derived from prescription that has accrued. Official Comment (c) to LSA-C.C. Art. 3449; Comment, Interruption of Prescription by Acknowledgment in Louisiana, 14 Tul.L.Rev. 430 (1940). In legal effect, acknowledgment interrupts prescription and erases the time that has accrued, with prescription recommencing anew from the date of interruption; renunciation obliterates the effect of prescription that has run. Because of these differences, renunciation is subject to more stringent requirements than acknowledgment. Comment, Prescription and Peremption The 1982 Revision of the Louisiana Civil Code, 58 Tul.L.Rev. 593, 611 (1983).
Our courts have consistently held that renunciation must be "clear, direct, and absolute and manifested by words or actions of the party in whose favor prescription has run." Queen v. W. & W. Clarklift, Inc., 537 So.2d 1214 (La.App. 4th Cir.1989); Bordelon's, Inc. v. Littell, 490 So.2d 779 (La.App. 3rd Cir.1986); McPherson v. Roy, 390 So.2d 543 (La.App. 3rd Cir.1980), writ denied, 396 So.2d 910 (La. 1981). According to civil tradition, renunciation is a unilateral act requiring neither acceptance by the other party, nor requiring any formality. Official Comment (d) to LSA-C.C. Art. 3449. According to the Louisiana jurisprudence, renunciation requires a new promise to pay the debt, as "[a] new obligation binding on the debtor is created when a promise to pay is made after prescription has accrued." Bordelon, 490 So.2d at 781. By "promise" here is meant a "`pledge to another to do or not to do *632 something specified; narrowly, a declaration which gives to the person to whom it is made the right to expect or to claim the performance or forbearance of a specified act.'" Id. (quoting Succession of Aurianne, 219 La. 701, 53 So.2d 901 (1951)).
As indicated above, a lesser showing is required to establish an acknowledgment. Indeed, on original hearing in Flowers v. United States Fidelity & Guaranty Co., 381 So.2d 378, 382 (La.1980), we construed LSA-C.C. Art. 3520 (the predecessor to LSA-C.C. Art. 3464),[4] as requiring only a simple acknowledgment by the party who owes the debt, requiring only that the right or obligation be recognized, and requiring no particular form. While on rehearing in Flowers, supra, we reversed based on a corrected factual finding, we reaffirmed the legal principles delineated in our original decision.[5] On rehearing, we also extensively reviewed the civilian doctrinal writings regarding acknowledgment. Based on our review, we confirmed that an acknowledgment is subject to no particular formality, with one caveat discussed below, and reaffirmed as solidly based upon the doctrinal writings our holding in Lake Providence Equipment Co. v. Tallulah Production Credit Ass'n, 257 La. 104, 241 So.2d 506 (1970), that acknowledgment sufficient to interrupt prescription may be made verbally, in writing, by partial payment, by payment of interest or by pledge, or in other ways; or it may be implicit or inferred from the facts and circumstances. See also Comment, Interruption of Prescription by Acknowledgment in Louisiana, 14 Tul.L.Rev. 430, 435 (1940) (noting that the essence of acknowledgment is not its form, but the debtor's recognition of the creditor's right to the debt claimed by him).
The one caveat alluded to above is that a different set of rules, while not mentioned in the text of LSA-C.C. Art. 3464, has developed with regards to acknowledgment of a mineral servitude. In Flowers, supra, we expressly noted that while public policy warrants recognizing acknowledgment of ordinary obligations on an informal basis, the same is not true of acknowledgment of a mineral servitude. 381 So.2d at 382 n. 1; See also Official Comment to LSA-R.S. 31:54 (noting that acknowledgment of mineral servitudes is different from acknowledgment of ordinary obligations). Indeed, a rigid set of formal rules has been developed, both jurisprudentially and statutorily, to assure a landowner is fully aware of, and clearly intends the legal consequences of, his act in acknowledging an outstanding mineral servitude. Statutorily, these rigid requirements are set forth in the LSA-R.S. 31:54 and 55.[6] Jurisprudentially, these rigid requirements were developed when our courts engrafted *633 onto LSA-C.C. Art. 3464 (former LSA-C.C. Art. 3520) an intent requirement: the acknowledgment must be accompanied by or coupled with a clear declaration of intent to interrupt the prescription then running. This additional requirement was designed to put to rest the notion that a "mere" or "simple" acknowledgment alone could reinvest a mineral servitude owner with the valuable property right of another term. Daggett, Mineral Rights in Louisiana, § 15, pp. 75-78 (1949).
Over five decades ago, the imposition of this intent requirement, even in the mineral servitude context, was questioned: "the requirement that this acknowledgment must be made with the intention of interrupting prescription is not in accordance with the majority of the jurisprudence." Comment, Interruption of Prescription by Acknowledgment in Louisiana, 14 Tul.L.Rev. 430, 438 (1940). Nonetheless, our courts have extended this intent requirement to ordinary obligations, including delictual actions. This extension can be traced to Marathon Insurance Co. v. Warner, 244 So.2d 353 (La.App.2d Cir. 1971), in which the Second Circuit, while recognizing that this intent requirement arose in cases dealing with mineral servitudes, found that "the principle is equally applicable whatever the prescription and whatever the character of the claim to which it applies." Id. at 356. The jurisprudence is sprinkled with cases involving acknowledgment of ordinary obligations in which the courts have set forth this additional requirement of an intent to interrupt prescription, generally citing Marathon, supra, for this proposition. We find the imposition of this intent requirement inconsistent with the doctrinal writings and the public policy permitting acknowledgment of ordinary obligations on an informal basis. Thus, we expressly overrule Marathon, supra, insofar as it held that an acknowledgment must be coupled with a clear declaration of intent to interrupt prescription in order to interrupt prescription on a delictual obligation.
In Flowers, supra, we also held that a delictual action may be tacitly acknowledged, finding no basis in the Civil Code for insulating rights based on offenses or quasi-offenses from acknowledgment. 381 So.2d at 382. We further held that unliquidated debts could be acknowledged, overruling jurisprudence to the contrary. Id. Revisiting the doctrinal writings, we reaffirm as solidly based our holding in Flowers, supra, that delictual claims for unliquidated amounts may be tacitly acknowledged.
Aubry and Rau, as quoted in Flowers, supra, comment that "[tacit acknowledgment] would be true of an offer to pay damages caused by a tort, made by the defendant in the course of the trial, or of an actual act of reparation or indemnity." 2 Civil Law Translations-Aubry & Rau, Property § 215, No. 304, p. 344 (La.St. L.Inst.Trans.1966). Aubry and Rau also comment that acknowledgment may result from "real, or even verbal offers of payment which were not accepted, provided that in either case the offer was unconditional and not an offer to settle the claimed debt." Similarly, Carbonnier comments that "acknowledgment may be merely tacit. It can result from any attitude of the debtor which implies an unequivocal admission of the creditor's right." 5 Civil Law Translations, J. Carbonnier, Notes on Liberative Prescription, pp. 465-66. See also 2 M. Planiol, Treatise on the Civil Law, §§ 665 et seq. (La.St.L.Inst.Trans.1959).
Also, Baudry-Lacantinerie and Tissier comment:
Acknowledgment is a simple admission.... A simple admission does not result in new legal ties. It only shows that the debt is not extinguished, that the creditor was not negligent, that the owner had a reason for not acting to preserve his right....
Acknowledgment interruptive of prescription results from any act or fact which contains or implies the admission of the existence of the right. It can be express or tacit. ... [I]t can result from... an offer made by the debtor even if not accepted by the creditor, at least if it is not conditional or in the nature of a mutual settlement....

*634 Tacit acknowledgment can, in general, result from acts or instruments which imply an acknowledgment of the existence of a right subject to prescription.
[A]n acknowledgment is interruptive of prescription with regard to civil obligations arising from a delict, as well as those arising from contract and quasi-contract.
Going even further, if the debtor, without formally acknowledging his debt, has by his conduct or acts led the creditor to believe that he did not intend to contest it, it is possible to conclude that he committed a wrong for which he is liable in damages, and which prevents him from invoking his prescription.
The courts have held that acknowledgment by the author of the delict of his liability interrupts prescription. If the acknowledgment is tacit, it is necessary to ascertain that the alleged facts imply a definite admission of liability. Care in the case of accident, given because of humanitarian or charitable considerations, does not represent an admission of liability.
5 Civil Law TranslationsBaudry-Lacantinerie & Tissier, Prescription, §§ 476, 527-35 (esp. 531), 647 (emphasis supplied).
Based on the above doctrinal writings, the following generalizations may be made. A tacit acknowledgment occurs when a debtor performs acts of reparation or indemnity, makes an unconditional offer or payment, or lulls the creditor into believing he will not contest liability. Conversely, mere settlement offers or conditional payments, humanitarian or charitable gestures, and recognition of disputed claims will not constitute acknowledgments. These generalizations are reflected in the host of cases addressing the issue of what constitutes a tacit acknowledgment. Our courts have added to the above generalizations other criteria that evidence an acknowledgment, including undisputed liability, repeated and open-ended reassurances of payment, and continuous and frequent contact with the creditor throughout the prescriptive period.[7] Conversely, our courts have recognized that mere recognition of a disputed claim, conditional payments, and settlement or compromise offers or negotiations do not evidence an acknowledgment.[8]
Summarizing the above jurisprudential principles, a renunciation of prescription is an abandonment of the right derived from prescription that has accrued and is subject to stringent proof requirements. An acknowledgment is a simple admission of liability resulting in the interruption of prescription that has commenced to run, but not accrued, and may be made on an informal basis.[9]

V.
Applying the principles delineated above to the instant case, Schmidt's letters dated August 14, 1987, and January 8, 1988, clearly evidence his acknowledgment of the Limas' right to redress because of his error and omission. In his August 14th letter to the Limas, Schmidt informed them that he was negotiating with Bank to reacquire the property, stating:
[I]t is my intent to acquire this property and reconvey the same to you placing *635 you back in the original position which you were entitled.
Subsequent to the reacquisition of the property, it is my position to secure reimbursement from all sources available including the seizure and satisfaction of the note executed by you at the Act of Exchange.
In his January 8th letter to the Limas' counsel, Schmidt does not deny liability or question the Limas' right to recover against him. Rather, he reaffirms that his intent was "the return of the Limas to the same position that they would have enjoyed had the collateral been properly substituted and the property conveyed as originally intended." Schmidt also states that "[f]rom the outset I have suggested that [the Limas] seek other advice to explore all claims which they may have or may have had against me individually under the obvious error and omission as made." (emphasis supplied). Further, Schmidt offers, in lieu of returning the original property, to convey full title to a parcel having superior location, timber and development potential.
Although now characterized by Schmidt's counsel, and even by the Limas' counsel in his August 25th letter, as settlement offers, Schmidt's letters, we find, were clear acknowledgments of his liability and of his obligation to make the Limas whole. Indeed, while a stream of correspondence may constitute a compromise or settlement agreement, see Felder v. Georgia Pacific Corp., 405 So.2d 521 (La.1981), an essential element such an agreement must contain is reciprocal concessions of the parties in adjustment of their differences. See LSA-C.C. Art. 3071; Rivett v. State Farm Fire and Casualty Co., 508 So.2d 1356 (La.1987); Collins v. Capital Valve and Fitting Co., 409 So.2d 579 (La. 1982), reh'g denied, 412 So.2d 101 (La. 1982); First National Bank of Jefferson Parish v. Manor Heights Co., 576 So.2d 61 (La.App. 5th Cir.), writ denied, 577 So.2d 35 (La.1991). Reciprocal concessions are clearly lacking in these letters. Rather, as evidenced by the use of unconditional language, the substance of these letters reveals that these letters were not mere settlement offers, but rather were acknowledgments of the debt or liability. In this regard, the following comment is particularly apt: "the most fruitful source of written acknowledgments is found in letters written by the debtor." Comment, Interruption of Prescription by Acknowledgment in Louisiana, 14 Tul.L.Rev. 430, 433 (1940).
Schmidt's counsel also attempts to characterize his offers in the letters as mere humanitarian or charitable gestures. We reject this argument. While as recognized by the Fourth Circuit in Melton v. United States Fidelity and Guaranty Insurance Co., 531 So.2d 1140 (La.App. 4th Cir.1988), and as we noted above, the doctrinal writers have indicated that a humanitarian or charitable gesture does not constitute a tacit acknowledgment, Schmidt's offer to reacquire the property for $28,000 and to reconvey the property to the Limas can hardly be characterized as prompted by humanitarian or charitable motives. Cf. Mikulecky v. Marriott Corp., 854 F.2d 115, 119 (5th Cir.1988) (defendant's willingness to pay a modest amount to terminate litigation or to satisfy some feeling of natural obligation is not a tacit acknowledgment).
Accordingly, we conclude that Schmidt's August 14th and January 8th letters, coupled with his actionsfooting the entire defense cost of the foreclosure suit, pursuing attempts to reacquire the property and the outstanding note, and offering to otherwise satisfy his obligation and to make the Limas wholeplainly establish Schmidt's intent to acknowledge and recognize his responsibility for, and the Limas' right to redress arising out of, his negligent conduct. Contrary to Schmidt's argument, the admission of "obvious error and omission" contained in his January 8th letter can hardly be read to refer to anyone else's conduct but his own. Indeed, we find that Schmidt's repeated reassurances to the Limas that he would make them whole is inconsistent with an intent to do anything but acknowledge his obligation to them.[10]
*636 Schmidt's acknowledgment in August 1987 and again in January 1988 interrupted prescription, which began to run anew on the latter date. LSA-C.C. Art. 3466. Thus, the Limas' suit filed in November 1988 was timely. The lower courts erred in deciding otherwise.
Because of this determination, it is unnecessary to consider the Limas' alternative renunciation argument.

VI.
For the reasons assigned, the judgment of the district court as affirmed by the court of appeal is reversed, and the exception of prescription is overruled. The case is remanded to the district court for further proceedings.
REVERSED AND REMANDED.
NOTES
[1] In 1990, the legislature enacted LSA-R.S. 9:5605, which sets forth a specific statutory provision governing the liberative prescriptive period for legal malpractice actions. As the Limas' cause of action arose before the effective date of this statute, we conclude that this statute cannot apply. Lott v. Haley, 370 So.2d 521 (La.1979); See also Harvey v. Dixie Graphics, Inc. and Touche Ross & Co., 593 So.2d 351 (La.1992).
[2] This rule is subject to two exceptions (1) when the attorney expressly warrants a specific result and fails to obtain that result, and (2) when the attorney agrees to perform certain work and does nothing whatsoever. In these two contexts, the action is in contract and subject to the ten-year prescriptive period provided by LSA-C.C. Art. 3499. See Gifford v. New England Reinsurance Corp., 488 So.2d 736, 738 (La.App. 2d Cir.1986) (collecting cases).
[3] We note that the record is unclear as to when the Limas first learned of Bank's mortgage on the property. As neither in brief nor in argument before this Court did Schmidt contest the court of appeal's finding that prescription did not commence running until July 1985, and since that finding, which was based on Rayne State Bank, supra, is supported by the jurisprudence, see Riddick & Miller Investment Co., Inc. v. Denicola, 486 So.2d 186 (La.App. 1st Cir.), writ denied, 489 So.2d 1275 (La.1986), we accept that finding as correct.
[4] Official comment (a) to LSA-C.C. Art. 3464 indicates that this article reproduces the substance of former LSA-C.C. Art. 3520 and does not change the law.
[5] Flowers, supra, was a delictual action brought by a husband and wife, before the repeal of the head and master community property laws, against an insurance company for damages they suffered as a result of an automobile accident. We found that neither the insurance company's acknowledgment of the husband's right to reimbursement of his wife's medical expenses by making unconditional payments, nor the insurance company's willingness to discuss settlement with the wife were sufficient to interrupt prescription of the wife's personal injury claim because the statements and actions of the company's representatives failed to manifest an intent to admit liability to the wife. Our holding was premised on the rule that interruption of prescription does not regularly transfer from one obligation to another. Flowers, 381 So.2d at 383. That rule is inapplicable, however, when one claim is virtually comprised in another and when two actions against the same person arise from the same right. Indeed, that rule has been applied only when different rights were involved. 5 Civil Law TranslationsBaudry-Lacantinerie & Tissier, Prescription, §§ 574-76. Thus, while the Limas asserted more than one claim against Schmidt, all of the Limas' claims arise out of the same right, i.e., redress for the "error and omission." Thus, we find that rule inapplicable.
[6] LSA-R.S. 31:54 provides that "[t]he prescription of nonuse may be interrupted by a gratuitous or onerous acknowledgment by the owner of the land burdened by a mineral servitude. An acknowledgment must be in writing, and, to affect third parties, must be filed for registry." LSA-R.S. 31:55 provides that "[a]n acknowledgment must express the intent of the landowner to interrupt prescription and clearly identify the party making it and the mineral servitude or servitudes acknowledged."
[7] See Williams v. American Family Mutual Insurance Co., 520 So.2d 1082 (La.App. 3rd Cir. 1987); Wallace v. State Farm Mutual Automobile Insurance Co., 509 So.2d 466, 469-70 (La. App. 3rd Cir.), writ denied, 510 So.2d 377 (La. 1987); Guice v. Mustakas, 490 So.2d 390 (La. App. 5th Cir.1986); Odessa House v. Goss, 453 So.2d 299 (La.App. 3rd Cir.1984); Richardson v. Louisiana Farm Bureau Mutual Insurance Co., 393 So.2d 200, 202-3 (La.App. 1st Cir.1980), writ refused, 398 So.2d 529 (La.1981).
[8] See Farley v. Pat Todd Oil Co., Inc., 544 So.2d 754 (La.App. 3rd Cir.), writ denied, 548 So.2d 1230 (La.1989); Touchet v. State Farm Fire & Casualty Co., 542 So.2d 1142, 1144-45 (La.App. 3rd Cir.), writ denied, 546 So.2d 1214 (La.1989); De Francesch v. Ralph Peterson & Associates Insurance Agency, 508 So.2d 1014, 1016 (La.App. 5th Cir.1987); Frederick v. Aetna Life & Casualty Co., 467 So.2d 600, 602 (La.App. 3rd Cir.1985); White v. Miller, 447 So.2d 1192, 1194-95 (La. App. 5th Cir.), writ denied, 449 So.2d 1357 (La. 1984); Trainer v. Aycock Welding Co., 421 So.2d 416, 417-18 (La.App. 1st Cir.1982).
[9] An exception, of course, is an acknowledgment of a mineral servitude, which as discussed in detail above, is statutorily subject to rigid requirements.
[10] Commentators have cited similar conduct as warranting an estoppel tolling prescription, giving as an example "a lawyer who induced his clients not to file a lawsuit upon the representation that either he or his insurer would make them whole." Mallen and Smith, Legal Malpractice, § 18.13, p. 123 (3d Ed.1989) (citing Marholin v. Kaye, 503 So.2d 950 (Fla.App. D3 1987)). In Marholin, supra, the court reversed a summary judgment in favor of the attorney, finding a material issue of fact as to whether the attorney "lulled" his clients into delaying filing suit against him by acknowledging his responsibility for their loss and urging they refrain from filing suit in exchange for which he would make them whole, either personally or through his insurer. As an aside, we note that in the instant case, the Limas allege in their petition that Schmidt assured them that he had advised his insurance company of the error and omission; in his answer, however, Schmidt denies this allegation.