BROWN, Judge.
In 1988, Robbie’s Auto Body Shop, Inc. (Robbie’s Auto), executed and delivered to the Bank of Jena (Bank) a promissory note in the amount of $92,996.23. This note was endorsed and guaranteed by Robbie McNe-mar, Debbie McNemar and Julius A. McNe-mar. The note was secured by various collateral mortgages, one of which covered land and improvements used as a shop by Robbie’s Auto.
Because of a prior history of fire loss, Robbie’s Auto was uninsurable; however, the Bank purchased a special policy of insurance to cover the body shop from Voyager Guaranty Insurance Company (Voyager). The Bank was able to obtain this coverage as a lender to insure its collateral.
On March 13, 1989, a fire occurred at the body shop. Robbie McNemar telephoned the information about the fire to the Bank’s vice president, Jay Broadwell, on March 14, 1989. Broadwell immediately notified Voyager of the fire. Within a few days, Broadwell was contacted by Richard Hatcher of North American Adjusters, Inc. (North American), who advised that he would be investigating and adjusting the claim on behalf of Voyager.
Hatcher inspected the property and on June 23, 1989, submitted to the Bank a Sworn Statement In Proof of Loss, a Hold Harmless Agreement and a Subrogation Receipt indicating payment in the amount of $35,530.98 for the loss. Broadwell contacted Robbie McNemar about Hatcher’s settlement documents and was informed by McNemar that the proposed payment was inadequate to repair or replace the building. Thereafter, Broadwell informed Hatcher that McNemar would obtain a separate estimate. Broadwell and Hatcher had several telephone conversations concerning the failure of McNemar to provide an estimate. Hatcher advised that he would obtained a second estimate from a construction company in Monroe, Louisiana. However, this second opinion was never sought by Hatcher.
During this time the promissory note fell into default. On June 7, 1990, the Bank filed suit against Robbie’s Auto and the McNemars for the balance owed on the promissory note with Voyager included as an additional defendant as the insurer of the fire-damaged collateral. A judgment against Robbie’s Auto and the McNemars has not been appealed. The trial court rejected Voyager’s plea of prescription for the following reasons:
After reading all of the material submitted, the court is of the opinion that there was an acknowledgment of debt by Voyager and it’s agency, North American •Adjusters, which interrupted the prescriptive period.
The acknowledgment of debt was made through the “Subrogation Receipt” which was to be signed by the bank for payment of thirty-five thousand five hundred thirty dollars and ninety-eight cents ($35,530.98) for full settlement of all claims.
The court finds that the Bank of Jena is entitled to judgment against Voyager for the fair market value of the total loss of the building, together with a charge of two thousand ($2,000.00) dollars for the cost of demolition, subject only to the deductible provisions of the policy.
*138 Pursuant to the above Reasons for Judgment, the trial court ordered:
That there be Judgment herein in favor of Bank of Jena and against Voyager ... in the full sum of $53,000.00, subject to a deduction and credit in the amount of $500.00, together with legal interest thereon from the date of judicial demand.
From this judgment, Voyager appeals, assigning the following as error:
1. The trial court erred in holding that Voyager had acknowledged a debt owed to the Bank of Jena, thus interrupting the one year prescriptive period of LSA-R.S. 22:691.
2. The trial court erred in holding Voyager liable for any sums in excess of the amount set forth in the alleged acknowledgment [$35,530.98].
3. The trial court erred in calculating the extent of the loss based on the total loss of the property instead of the cost of repair.
4. The trial court’s award of $53,000.00 was contrary to the evidence presented. (Petitioner concedes that the award was $2,000 too high).

DISCUSSION

PRESCRIPTION

LSA-R.S. 22:691 sets forth the provisions governing fire insurance and requires that suit be commenced within twelve months after the loss. In an amended answer Voyager asserted that petitioner’s claim had prescribed. The petition clearly discloses that the time limitation for commencing suit had run. The loss occurred on March 13, 1989, and this action was instituted on June 7, 1990. Thus, it became plaintiff’s burden to show an interruption of prescription, to avoid dismissal. Lima v. Schmidt, 595 So.2d 624 (La.1992).
Prescription may be interrupted “when one acknowledges the right of the person against whom he had commenced to prescribe.” LSA-C.C. Art. 3464. If interrupted, prescription starts to run anew from the last day of the interruption. LSA-C.C. Art. 3466. The trial court found that there had been an acknowledgment of the debt by Voyager through its adjuster, Hatcher, on June 23, 1989. Specifically, the trial court found that the debt was acknowledged through the Subrogation Receipt submitted by Hatcher to the Bank.
Voyager argues that Hatcher had neither actual nor apparent authority to acknowledge the debt. Alternatively, even if such authority is found, Voyager argues no acknowledgment took place.

HATCHER’S AUTHORITY

Voyager argues that Hatcher was an employee of an independent adjusting firm with no authority to settle claims over $10,-000. When a claim is projected to exceed $10,000, the adjuster is required to obtain a Sworn Statement In Proof of Loss from the named insured and submit it to Voyager for its acceptance or rejection.
Mandate is an act by which one person, a principal, gives power to another, an agent, to act for him and in his name. LSA-C.C. Art. 2985. The Civil Code precisely sets forth the rights and duties as between the principal and agent, but is less specific concerning the relationship between the principal and third parties. It is important to distinguish the agreement between the principal and agent from the power of the agent to affect the principal’s legal relationship with a third party. In the instant case, the agent, Hatcher, had no actual authority to bind the principal, Voyager, beyond $10,000. The issue, however, is whether the manifestations of the principal, Voyager, to the Bank resulted in a reasonable belief by the Bank that the agent possessed the power to bind the principal. Louisiana courts have consistently recognized the doctrine of apparent authority where an agent binds his principal beyond the scope of their actual agreement. Tedesco v. Gentry Development, Inc., 540 So.2d 960 (La.1989); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987), citing Interstate Electric Co. v. Frank Adam Electric Co., 173 La. 103, 107, 136 So. 283, 285 (1931).
For the doctrine of apparent authority to apply, the principal must first *139 cause an innocent third party to reasonably believe that the agent has the power to engage in the particular transaction. Second, the third party must rely on this belief. If so, the principal will be bound to the third party for the agent’s actions. The burden of proving apparent authority is on the party relying on its applicability. Boulos, supra.
The trial court’s finding that Hatch-er, an employee of North American, had the apparent authority to acknowledge the debt is supported by the evidence. The Bank contacted Voyager concerning the fire loss. Voyager in turn contacted North American to adjust the claim. North American dispatched Hatcher to investigate and deal with the Bank.
Hatcher contacted and informed a Bank official, Jay Broadwell, that he would be adjusting the claim on behalf of Voyager. At no time did Hatcher or Voyager indicate or disclose to Broadwell, or any other Bank official, that Hatcher’s authority to settle claims was limited to $10,000. The record, as evidenced by the following excerpt, illustrates that neither Voyager nor North American explained this purported limit on Hatcher’s authority:
Q. Let me repeat the question, Mr. Broadwell. Did Mr. Hatcher ever advise you that he or his company had no authority to bind or to commit Voyager Insurance Company to a settlement?
A. No. sir.
Q. Did you ever receive a copy of any contract or agreement or memorandum between Mr. Hatcher’s company or Mr. Hatcher and Voyager with respect to how they operated between those two companies?
A. No. Sir.
Mr. Broadwell’s testimony was confirmed by the deposition testimony of Richard Hatcher:
Q. In this particular instance, I think Mr. Seamster asked and you testified affirmatively that you did not indicate to Mr. Broadwell or anyone else with the Bank of Jena that North American had the authority to bind Voyager; is that correct?
A. Yes, sir.
Q. Did you tell them that you did not have the authority to bind Voyager? A. I don’t think it came up per se in a conversation like that, no sir.
Given the evidence submitted, we hold that the trial judge was not clearly wrong in finding Hatcher had apparent authority to acknowledge the claim.

ACKNOWLEDGMENT

Voyager argues that even if Hatch-er had the apparent power to acknowledge a debt on behalf of Voyager, said acknowledgment must be accompanied by or coupled with a clear declaration of intent to interrupt prescription. (Emphasis added). Voyager cites several cases supporting its position that clear intent to interrupt prescription is a prerequisite to acknowledgment. Emery v. Cabral, 400 So.2d 340 (La.App. 4th Cir.1981), writ denied, 405 So.2d 533 (La.1981), citing Marathon Ins. Co. v. Warner, 244 So.2d 353 (La.App.2d Cir.1971).
However, Lima v. Schmidt, 595 So.2d 624 (La.1992), expressly overrules Marathon, supra, and addresses under which circumstances acknowledgment occurs and whether that acknowledgment must be accompanied by a clear declaration of intent to interrupt prescription. In Lima, the court stated:
We find the imposition of this intent requirement inconsistent with the doctrinal writings and the public policy permitting acknowledgment of ordinary obligations on an informal basis. Thus, we expressly overrule Marathon, supra, insofar as it held that an acknowledgment must be coupled with a clear declaration of' intent to interrupt prescription in order to interrupt prescription on a delictual obligation.
Lima, 595 So.2d at 633.
The court also held that, except when dealing with mineral servitudes, an acknowledgment need not be in any particular form; it is sufficient if made verbally, *140 in writing, by partial payment of interest or by pledge, or is otherwise indicated by the facts and circumstances. The court further stated:
A tacit acknowledgment occurs when a debtor performs acts of reparation or indemnity, makes an unconditional offer or payment, or lulls the creditor into believing he will not contest liability. Conversely, mere settlement offers or conditional payments, humanitarian or charitable gestures, and recognition of disputed claims will not constitute acknowledgments. These generalizations are reflected in a host of cases addressing the issue of what constitutes a tacit acknowledgment. Our courts have added to the above generalizations other criteria that evidence on acknowledgment, including undisputed liability, repeated and open-ended reassurances of payment, and continuous and frequent contact with the creditor throughout the prescriptive period. Conversely, our courts have recognized that mere recognition of a disputed claim, conditional payments, and settlement or compromise offers or negotiations do not evidence an acknowledgment. (Emphasis added and footnotes omitted).
Lima, 595 So.2d at 634.
In Hatcher’s First Report to Voyager, he states that he originally requested a full investigation because it appeared that McNemar may have been involved in the arson; however, Hatcher states that Voyager rejected this recommendation, ordering only “a cause and origin investigation” as the claim “would be adjusted and the payment issued to the Bank of Jena.”
In accordance with these instructions from Voyager, Hatcher sent the Subrogation Receipt; however, the Bank questioned the amount offered and indicated it would delay acceptance until Robbie McNe-mar had an opportunity to obtain another estimate. In Hatcher’s report to Voyager on August 11, 1989, he anticipated closure of the file within 30 days “providing the documents [Robbie McNemar’s estimate] are received.” Hatcher wrote the Bank on December 11, 1989, expressing his frustration that “the bank would let Robbie [McNemar] hold things up as the building is in foreclosure or will be.” All of Hatch-er’s dealings with the Bank recognized that the claim was owed.
The trial judge concluded that prescription was interrupted by the actions of Voyager’s adjuster, Rick Hatcher, specifically his submission of a “Subrogation Receipt” which was to be signed by the bank for payment of thirty-five thousand five hundred thirty dollars and ninety-eight cents ($35,530.98) for full settlement of all claims. After having carefully reviewed the record, we cannot say the trial judge was clearly wrong or manifestly in error. In our view the documentary evidence and testimony contained in the record amply support the trial judge’s conclusion that the Bank’s right to recover was acknowledged.

THE AMOUNT ACKNOWLEDGED BY VOYAGER

Voyager argues that if the debt is found to have been acknowledged, said acknowledgment is limited to the amount stated, i.e., the $35,530.98 settlement offer. In support of its argument, Voyager cites Antrim Lumber Co. v. S.H. Bolinger Co., 121 La. 306, 46 So. 337 (1908), for the proposition that the amount acknowledged to be due cannot be expanded so as to take the whole claim out of prescription.
In Deville v. Louisiana Farm Bureau Insurance Company, 492 So.2d 895 (La.App. 3d Cir.1986), writ denied, 496 So.2d 332 (La.1986), the defendant pled prescription based upon the plaintiff’s failure to file suit within one year of the accident. In that case, the court determined that Mr. Tassin, who was acting as an agent for the defendant, Farm Bureau, assured the plaintiff that everything would be all right and advised the plaintiff some four days before the anniversary date of the accident that Farm Bureau would pay him $12,000. In affirming an award by the trial court in excess of $91,000, the court held:
We find from the evidence that the insurer intended to acknowledge Deville’s rights. In fact, a settlement had been negotiated. His “right” to recovery was recognized by the actions of the insurer *141 through its agent. Therefore, prescription of Deville’s claim was interrupted.
Like the court in Deville, supra, we find that Voyager acknowledged the Bank’s “right” to recover, thus interrupting prescription on the entire claim and not just a specified amount.

CALCULATING THE EXTENT OF THE LOSS

Voyager argues that the test for determining whether damaged property is a total loss is whether the cost of repair exceeds the value of the property. Dumond v. Mobile Ins. Co., 309 So.2d 776, 778 (La.App. 3d Cir.1975); Nicholas v. Continental Ins. Co., 296 So.2d 468, 469 (La.App. 4th Cir.1974). Voyager argues that the burden of proof fell upon the Bank, who produced no evidence as to the cost of repair. Voyager argues that in the absence of any evidence from the party bearing the burden of proof, the court was obligated to accept Hatcher’s estimate in the amount of $35,530.98 and erred in awarding the building’s fair market value.
After reviewing all the evidence submitted in connection with the building, we find that the trial court had sufficient evidence to determine that the building was a total loss. Phillip W. Beard, an engineering expert for the Bank, testified that all of the structure should be demolished from atop the foundation. A trial judge has much discretion in the evaluation of and the weight given the testimony of expert witnesses. Grady Roper Drilling v. Transcontinental, 586 So.2d 707, 710 (La.App. 3d Cir.1992), writ denied, 590 So.2d 592 (La.1992). Our review of the record convinces us that the trial court was not clearly wrong in accepting the testimony of Beard or in finding that the building was a total loss and awarding an amount equal to the building’s fair market value.

THE TRIAL COURT ERRED CALCULATING THE BUILDING’S FAIR MARKET VALUE

Voyager submits that the trial court erred in valuing the building at $51,000 instead of $49,000. The only estimate of the fair market value of the structure came from plaintiff’s witness, Mark Talley. Talley testified that the value of the structure was $49,000 and the land $2,000. The trial court recognized that there was no damage to the land. The judgment should have been for the value of the building only, i.e. $49,000. The Bank in brief has conceded this point.
Therefore, the judgment should be amended to reflect the fair market value of the building as $49,000.

CONCLUSION

For the foregoing reasons, we hold that the trial court was not clearly wrong or manifestly erroneous in finding that Voyager, through Rick Hatcher, acknowledged the debt owed by Voyager to the Bank of Jena. Furthermore, the acknowledgment was not limited to the amount set forth in the “Subrogation Receipt.”
Finally, we hold that the trial court did not err in concluding the building was a total loss, but incorrectly valued the building at $51,000. Accordingly, we amend the judgment to value the building at $49,000 and affirm the additional award of $2,000 for demolition costs.[1] Costs are assessed against Voyager.

DECREE

AFFIRMED IN PART; REVERSED IN PART; AMENDED AND RENDERED.

. Voyager withdrew its allegation that this cost was not proper.