607 So.2d 892 (1992)
RED RIVER VALLEY BANK, Appellant,
v.
The HOME INSURANCE COMPANY, et al., Appellees.
No. 24068-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1992.
*893 C. William Gerhardt & Associates by C. William Gerhardt, Shreveport, for appellant.
Theus, Grisham, Davis & Leigh by F. William Sartor, Jr., Monroe, for appellees.
Before MARVIN, LINDSAY and BROWN, JJ.
LINDSAY, Judge.
The plaintiff, Red River Valley Bank, appeals from a trial court judgment sustaining the defendants' exception of one-year prescription in this legal malpractice action concerning an allegedly erroneous title opinion. For the reasons assigned below, we affirm.

FACTS
In February of 1987, attorney Harvey P. DeLaune was hired to perform certain legal work in connection with a real estate transaction between the now-defunct Bank of the Mid-South (BMS) and A-Associates, a real estate developing company owned by Thomas Arnold and Warren Moore. BMS wished to exchange certain of its non-earning assets, which it had acquired by foreclosure, for earning assets. One of BMS's non-earning assets was an apartment complex known as the Wanda Street Apartments in Bossier City. BMS carried this property on its books at a value of about $475,000.
Thus, in order to dispose of this property, BMS entered into an agreement whereby it would sell the Wanda Street Apartments to A-Associates and, in return, it would receive cash and assignments of various mortgage notes held by A-Associates with a total face value of $475,000. BMS required title opinions showing that the mortgages it obtained from A-Associates were first mortgages.
Mr. DeLaune had previously performed legal work for A-Associates. Therefore, because of his access to files pertaining to A-Associates' prior dealings, BMS decided to hire him to prepare the assignments of the mortgage notes, as well as title opinions showing the status of the mortgages.
*894 In working on this transaction, Mr. DeLaune and his paralegal, Janelle Ward, primarily dealt with William Means, BMS's senior vice-president and commercial lending officer, and John Price, BMS's president. Mr. Means had gone through numerous notes held by A-Associates and made a handwritten worksheet listing the notes which BMS was willing to accept in exchange and in payment for the apartments.
One of these notes was a $27,000 mortgage note executed to future holder by Thomas Sanders and Jo Nell McCormick Sanders on October 1, 1986. This note was secured by a vendor's lien and mortgage, recorded October 3, 1986, covering Lot 1, Preston Acres Subdivision, Unit # 2, and 10 acres adjacent thereto, which were located in Caddo Parish. (Apparently, A-Associates had purchased and developed the property, then sold it to the Sanders.)
In addition to this encumbrance, two other priming mortgages affected this property. One was a special mortgage for $300,000 recorded on June 27, 1986. This mortgage covered Lot 1. (However, this mortgage, which was held by Citizens Bank, was cancelled in March, 1987, about two weeks after Mr. DeLaune issued his title opinion, as mentioned hereafter.) The other was a special mortgage for $500,000, covering the 10-acre tract, executed by A-Associates to future holder and recorded on July 30, 1986; National Bank of Bossier (NBB) held this mortgage.
BMS's agreement with A-Associates provided that BMS would pay for the releases of any priming mortgages so that BMS could hold the first mortgages as security for the payment of each note. At one point, Mr. Means removed the Sanders note from his list of acceptable notes because the costs of securing the releases on its prior encumbrances were deemed to be too high. However, BMS later decided that the face value of the note was needed to show on its books that it had received a total value of $475,000 for the apartments. Consequently, Mr. Means later instructed Ms. Ward to include the note on the list.
Although Mr. Price and Mr. Means were aware of the prior encumbrances on several pieces of property, including the Sanders tract, they told Mr. DeLaune to write title opinions stating that BMS held the first mortgages on these properties. Mr. Price advised Mr. DeLaune that BMS was going to obtain the releases of the prior mortgages as soon as possible. Therefore, he saw no reason for the title opinions to include these prior mortgages since the title opinions would require amendments after the releases were secured.
Mr. DeLaune agreed to write first mortgage title opinions only after he was guaranteed by Mr. Price that BMS would immediately fund the releases of the prior encumbrances. Mr. DeLaune's title opinion showing that BMS held the first mortgage on the Sanders property was issued on February 23, 1987.
Mr. DeLaune later learned that the prior encumbrances on four tracts of land covered by his title opinions had not been released. He wrote to BMS on May 14, 1987, requesting that funds of approximately $19,000 be provided to remedy the situation. Mr. DeLaune stated that if the funds were not sent he would furnish amended title opinions showing the priming mortgages. In response to this letter, BMS sent Mr. DeLaune a check in the requested amount to secure the releases in July, 1987. With these funds, Mr. DeLaune obtained releases on three tracts.
Unfortunately, funds to pay the remaining priming mortgage on the Sanders property were not forthcoming, and the release on this particular property was not secured. (As previously noted, the mortgage held by Citizens Bank had been cancelled in March, 1987, leaving only the NBB mortgage in the original amount of $500,000 to prime the mortgage held by BMS.)
Upon noticing this omission, Mr. DeLaune obtained a copy of the mortgage certificate on the Sanders property and went to see Mr. Means. Mr. Means acknowledged that BMS was aware of the situation and was trying to obtain the funding for the release. Mr. DeLaune was told that there were on-going negotiations with NBB whereby they hoped to secure the release at no cost to BMS. Mr. DeLaune *895 accepted Mr. Means' reassurances that the problem was being resolved, and he did not pursue the matter further.
Mr. Means chose not to include Mr. DeLaune's letter of May 14, 1987, in the file on the Sanders note because he did not wish to "cloud" the file. As BMS anticipated an examination by the FDIC, it wished to maintain "clean files," the contents of which could not be criticized by the bank examiners.
In 1988, BMS was placed in receivership. Thereafter, the FDIC sought buyers who would be interested in purchasing the bank and its assets. On August 25, 1988, the plaintiff, Red River Valley Bank, bought BMS in a "dirty bank" deal.[1] As part of its purchase, Red River Valley Bank obtained the Sanders note, along with the other assets of the defunct bank. Although it had the option of refusing some loans, the plaintiff acquired all of BMS's outstanding loans with the exception of some unissued lines of credit. The plaintiff contends that in purchasing the Sanders note, it relied upon Mr. DeLaune's erroneous title opinion letter which was contained in the file. Subsequently, in May, 1989, the plaintiff learned of NBB's prior mortgage of $500,000 which affected the Sanders property.
On April 11, 1990, the plaintiff filed this legal malpractice suit against Mr. DeLaune; his firm, DeLaune & DeLaune; and their malpractice insurer, the Home Insurance Company. In response to the suit, the defendants filed an exception of no cause of action, no right of action, and prescription. They asserted the one-year prescriptive period for legal malpractice.
In connection with the hearing on the exceptions, the parties filed into evidence the depositions of Mr. DeLaune, Mr. Means, Ms. Ward, and Ralph C. Merritt, a senior vice president of the plaintiff bank. Also filed into the record was the affidavit of Mr. Means, as well as that of James L. Nelson, the plaintiff's attorney who, in May, 1989, had discovered the omission of the prior mortgage from Mr. DeLaune's title opinion.
Following the hearing, the trial court issued a written opinion in which it sustained the exception of prescription. It found that the prescriptive period of one year was applicable, and that the period expired on February 23, 1988, one year after the title opinion was rendered. The court noted that the plaintiff's suit was not filed until more than three years after the rendering of the title opinion. It further found that the doctrine of contra non valentum was inapplicable because the court did not believe that Mr. DeLaune acted with the intent to prevent the running of prescription. (Having sustained the exception of prescription, the trial court found that it was unnecessary to rule on the exceptions of no cause and no right of action.)
The plaintiff appealed.

LAW
As a general rule, an action for legal malpractice is a delictual action governed by the one-year prescriptive period of LSA-C.C. Art. 3492.[2] However, there are two exceptions to this rule: (1) when the attorney expressly warrants a specific result; and (2) when the attorney agrees to perform certain work and does nothing whatsoever. In those instances, the action is in contract, and the 10-year prescriptive period is applicable. Lima v. Schmidt, 595 So.2d 624 (La.1992); Gifford v. New England Reinsurance Corp., 488 So.2d 736 (La.App. 2d Cir.1986).
A legal malpractice claim based upon a title opinion generally states a cause of action in tort and is subject to the one-year prescriptive period. Crawford v. Gray and Associates, 493 So.2d 734 (La. App. 2d Cir.1986), writs denied, 497 So.2d 1012, 1013 (La.1986).
*896 Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action upon which the client may sue. Teague v. Scott, 597 So.2d 1060 (La.App. 2d Cir.1992).
When the face of the petition shows that prescription has run, the burden is upon the plaintiff to show why the claim has not prescribed. Lima v. Schmidt, supra.
To soften the occasional harshness of prescriptive statutes, Louisiana courts have recognized the jurisprudential exception, contra non valentum agere nulla currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Lima v. Schmidt, supra.
One of the four instances when contra non valentum can be applied is where the debtor has done some act (including concealment, fraud, misrepresentation, or other ill practices) effectually to prevent the creditor from availing himself of his cause of action. West v. Gajdzik, 425 So.2d 263 (La.App. 3d Cir.1983).[3]
In the absence of an attorney-client relationship, there generally can be no liability on the part of an attorney for malpractice. An exception to this rule is where the nonclient plaintiff is a third-party beneficiary of the attorney's work. Penalber v. Blount, 550 So.2d 577, 578 (La.1989); Capital Bank & Trust Company v. Core, 343 So.2d 284 (La.App. 1st Cir.1977), writ not considered, 345 So.2d 61 (La.1977), writ refused, 345 So.2d 504 (La. 1977); Clause v. Manuel, 442 So.2d 905 (La.App. 3d Cir.1983), writ denied, 448 So.2d 106 (La.1984).

DISCUSSION
The plaintiff argues that the one-year prescriptive period should be computed from May, 1989, the date of its discovery of the error in the title opinion. Thus, its suit, filed in April, 1990, would be timely. It further argues that having acquired the Sanders note from BMS, it acquired that bank's rights against Mr. DeLaune for malpractice. The plaintiff also argues that contra non valentum should be applied because Mr. DeLaune participated in a "conspiracy" to mislead FDIC bank examiners. We are not persuaded by any of these arguments.
We fail to see how the plaintiff can hope to gain anything by claiming that it stands in the shoes of BMS, Mr. DeLaune's client. The plaintiff's basic complaint against Mr. DeLaune is that he wrote the title opinion in the manner asked by BMS, the officers of which knew of the priming mortgages and fully understood the ramifications of their request. BMS, as Mr. DeLaune's client, would have no grounds to sue him for malpractice under these circumstances.
However, even assuming arguendo, that BMS could properly state a cause of action against Mr. DeLaune, we find that the one-year prescriptive period for legal malpractice had already accrued by the time the plaintiff acquired BMS's assets in August, 1988. The title opinion was issued on February 23, 1987. At that point, BMS had full knowledge of the situation and the necessity of paying off the prior encumbrances in order to actually hold the first mortgages on the properties covered by Mr. DeLaune's title opinions.
Thereafter, in order to attain its objective of obtaining first mortgages, BMS was required to issue a check for $19,000 to pay off the prior mortgages on several properties (with the exception of the NBB mortgage on the Sanders property, which was accidentally omitted). BMS was further *897 required to pay off the Citizens Bank mortgage on the Sanders property a few weeks after the title opinion was issued. (While Ms. Ward testified that she and Mr. DeLaune were not given the funds to secure this particular release, she testified that the Citizens Bank mortgage note was paid off and the paid note was brought to Mr. DeLaune's office in order for them to cancel the mortgage.) Once BMS had both acquired knowledge of the existence of the priming mortgages and had sustained damage in paying for mortgage releases and cancellations, prescription began to run, at the latest, in July, 1987, when the $19,000 check was issued and Mr. DeLaune reminded the bank to secure the release of the remaining uncancelled mortgage. Therefore, plaintiff's suit, filed on April 11, 1990, was clearly prescribed.
To avoid the one year prescription period, the plaintiff further contends that Mr. DeLaune was part of a conspiracy to mislead FDIC examiners who were about to undertake an imminent examination of BMS and that the doctrine of contra non valentum should be applied upon this basis. In support of this argument, the plaintiff quotes the following passage in Mr. Means' deposition:
Q. Did you explain to Mr. DeLaune why you were trying to get these opinions showing you had a legitimate first mortgage when in fact there were other mortgages?
A. I think at that time what we were trying to do was expedite it.
Q. Did you explain to him why; that is, it was for the examiners? Did you explain that?

A. Pretty much so without a doubt. We had numerous conversationsit was a very complicated deal. It was a large transaction and really we had never done anything like this before. When we put it all together, it worked and we weren't criticized but we told Harvey [DeLaune], we have got to show first real estate mortgage loans and the title opinion has to reflect that. They had to be comparable dates too on the exchanges and the title opinions, et cetera, to file a claim. (Emphasis theirs.)
However, at a later point in his deposition, Mr. Means clarified his statements:
Q. Okay. With respect to Mr. DeLaune's actual knowledge of the reason the impending bank examination, did Mr. DeLaune actually know there was an impending bank examination?
A. No. Like I say, we were doing this as curative work for our purposes, our purposes meaning Bank of the Mid-South....
. . . .
Q. But Mr. DeLaune didn't have any idea the bank regulators were coming in to look at these collateral loans, did he?
A. There would be no way for him to know they would be coming in. We didn't even know when. We just felt like they were coming in.
Q. That wasn't discussed with Mr. DeLaune?
A. No.
Q. There wasn't some sort of scheme set up with Mr. DeLaune to render falsified title opinions for purposes of bank regulators?
A. Not at all. We were trying to clean our house.
Also, Mr. DeLaune testified in his deposition that he had no personal knowledge at the time as to why Mr. Price wanted the priming mortgages omitted from the title opinions (other than as a matter of convenience to avoid the necessity of issuing a supplemental or amended title opinion).
Contrary to the assertions of the plaintiff, the evidence in this record does not demonstrate a "cover-up" involving Mr. DeLaune. Consequently, we find that the application of the doctrine of contra non valentum is unwarranted.
Furthermore, the record fails to show that the plaintiff actually relied upon Mr. DeLaune's title opinion in its purchase of the Sanders note. Specifically, Mr. Merritt testified that he could not say that he or any other officer of the plaintiff bank relied upon the title opinion in the Sanders file.
*898 Nor does it appear that the plaintiff would have been entitled to rely upon the title opinion as it was neither Mr. DeLaune's client or a third-party beneficiary of his work. See and compare Capital Bank & Trust Company v. Core, supra; Clause v. Manuel, supra; and Rolene Corporation v. Trois Amis, Inc., 572 So.2d 1089 (La.App. 1st Cir.1990).
We find no merit to the plaintiff's assignments of error.

CONCLUSION
The judgment of the trial court dismissing the plaintiff's suit is affirmed. Costs are assessed against the appellant.
AFFIRMED.
NOTES
[1] In his deposition, Ralph Merritt of Red River Valley Bank described a "dirty bank" deal as one in which the buyer acquired "[e]verything; buy the whole shebang, lock, stock, and barrel; the charge-offs, you know, all of the assets, deposits, the building, the equipment."
[2] Although LSA-R.S. 9:5605 now governs the liberative prescriptive period for legal malpractice, this statute was added in 1990, after any cause of action could have arisen in the present case. Consequently, it is inapplicable.
[3] The four situations in which contra non valentum may be applied are: (1) where there was a legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's claim; (2) where the plaintiff is prevented by some act of the defendant from availing himself of his cause of action; (3) where there was some condition coupled with the contract or connected with the proceedings which prevented the plaintiff from suing or acting on his claim; or (4) where the cause of action is not known or reasonably knowable by the plaintiff provided such ignorance is not attributable to the plaintiff's willfulness or neglect. Corsey v. State Department of Corrections, 375 So.2d 1319 (La.1979); Grant v. Carroll, 424 So.2d 389 (La.App. 2d Cir.1982).