672 So.2d 1053 (1996)
Killian L. HUGER, Jr.
v.
SEWERAGE AND WATER BOARD OF NEW ORLEANS.
No. 95-CA-2261.
Court of Appeal of Louisiana, Fourth Circuit.
March 27, 1996.
*1054 Mary-Elizabeth Paltron, New Orleans, for appellant.
Michael M. Christovich, Christovich & Kearney, L.L.P., New Orleans, for appellee.
Before SCHOTT, C.J., and LOBRANO and ARMSTRONG, JJ.
LOBRANO, Judge.
The Sewerage and Water Board of the City of New Orleans (the Board) appeals the trial court judgment which awarded plaintiff damages for the structural damage to his building at 812-818 Chartres Street. Plaintiff, Killian L. Huger, Jr., filed the instant suit asserting that the Board's failure to properly connect a drain line from his building to the street sub-surface line caused subsidence beneath a pilaster which supported his building's facade. As a result of that subsidence, Huger alleged that substantial cracking in the building's facade and structure occurred.
The trial judge agreed with Huger and awarded him $100,178.95 in damages, plus interest and court costs. The trial judge reasoned that "[t]he testimony and evidence demonstrated that the [Board] was responsible for the improper drainage connection which caused the washout condition and the subsequent differential settlement and cracking of the facade wall."
The Board perfects the instant appeal arguing that plaintiff's claim has prescribed, that plaintiff failed to prove a causal connection between the unconnected drain pipe and the damaged facade, that Civil Code Article 2317 is not applicable because of lack of notice and error by the trial court in deeming admitted those facts contained in plaintiff's request for admissions. We affirm.

PRESCRIPTION:
In 1989 plaintiff was notified by the Vieux Carre Commission that his property was in need of repairs due to cracks and sagging of the structure. As a result, plaintiff hired George Hopkins, an architect, to investigate the matter. As a result of his investigations, the particulars of which are detailed later in this opinion, Hopkins discovered a problem existing between the sidewalk and curb in front of plaintiff's building. This discovery was made in February 1992. In particular, he noted a unusual, large crevice or hole between the sidewalk and curb. He testified that this hole was large enough for a man to crouch in and that he could see back towards the plaintiff's building all the way to a cleanout. He also noted that the soil surrounding the cleanout had subsided. As a result, the Board was notified.
On May 28, 1992 there was an on site meeting among representatives of the Board, plaintiff, his attorney and an architect who worked for Hopkins. At that time, the Board decided to excavate in order to better determine the cause of the soil erosion. On May 30, 1992 the excavation revealed that the subsurface drain which extended to the downspout[1] from plaintiff's building was not connected to the main line running under the street.[2] Suit was not filed until November of 1993.
*1055 "When damage is caused to immovable property the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." La.C.C. art. 3493. The Board argues that plaintiff acquired sufficient knowledge to commence prescription at the earliest in 1989, and at the latest, on May 30, 1992. In either case, the one year period had lapsed when suit was filed in November of 1993.
Plaintiff counters that argument with the assertion that there was no reason, in 1989, to believe that the faulty connection was the cause of his damages and that, subsequent to May 30, 1992, prescription was interrupted by the Board's acknowledgment of its responsibility. Plaintiff asserts that it was not until September of 1993 that the Board denied any responsibility.
Normally, if the assertions in a petition clearly show that a plaintiff's claim is prescribed on its face, the plaintiff has the burden of proving an interruption or suspension. Alexander v. Minnieweather, 595 So.2d 802 (La.App. 2nd Cir.1992). Arguably the instant case falls into that category, although proof of knowledge to commence prescription usually rests with the persons asserting prescription. However, regardless of where the burden lies, we conclude that prescription did not accrue.
The only knowledge plaintiff acquired in 1989 was that which was received from the Vieux Carre' Commission. The Commission advised plaintiff of a problem with the brick facade of his building. There is no evidence at that time to suggest that the cause of the problem was a faulty connection of the drain line, or anything remotely close to suggesting the Board was responsible. It was not until February of 1992 when plaintiff's expert, George Hopkins, discovered the hole between the sidewalk and curb, that knowledge sufficient to start the prescriptive toll was acquired. At that point, the Board was notified and the May 30th excavation occurred. See, Brady v. Bunge Corp., 582 So.2d 346 (La.App. 4th Cir.1991), writ denied, 588 So.2d 100 (La.1991).
Plaintiff argues however, that the Board acknowledged its responsibility subsequent to the excavation and that acknowledgment interrupted the accrual of prescription. Plaintiff asserts the interruption continued until the Board denied any responsibility in September, 1993. Suit was filed in November of 1993 and was thus timely according to plaintiff.
Relying on interruption, plaintiff bore the burden of proof. "Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe." La.C.C. art. 3464. Once prescription is interrupted, it commences to run anew. La.C.C. art. 3466. Interruption by acknowledgment may be oral, in writing, formal, informal, express or tacit. Gulf Coast Bank and Trust Co. v. Eckert, 95-156 (La.App. 5th Cir. 5/30/95), 656 So.2d 1081, writ denied, 95-1632 (La. 10/6/95), 661 So.2d 474. With respect to delictual actions, the acknowledgment need not be of a certain amount of damages, only of the defendant's responsibility and plaintiff's right against that defendant. See, Lima v. Schmidt, 595 So.2d 624 (La.1992). "A tacit acknowledgement occurs when a debtor performs acts of reparation or indemnity, makes an unconditional offer or payment, or lulls the creditor into believing he will not contest liability." Id. at 634 (emphasis added).
At the time of the May 30, 1992 excavation, the evidence shows that one of the Board's representatives on the site, as well as the Board's claims investigator, acknowledged that the Board was responsible for the unconnected drainpipe.[3] Subsequently, the Board requested that plaintiff file a proof of claim, which he did.
Plaintiff's former attorney in this matter, James Selman, testified that he represented the plaintiff until September of 1993 and that Marilyn Magendie, the Board's claims investigator admitted the Board's responsibility to him on May 30, 1992 and never changed her *1056 position throughout his representation of plaintiff. Magendie testified that she had a telephone conversation with Selman in which she told him that the Board was going to deny the claim but she did not state the date of that conversation. She further testified that when she told Selman that the Board was going to deny the claim, he indicated to her that he would no longer be representing plaintiff in this matter because a lawsuit would have to be filed and he had a conflict of interest because of work he did for the Board. Magendie wrote a memorandum dated May 17, 1993 to the Board's claims manager in which she stated that she was recommending denial of the claim. Her testimony, however, does not establish when that information was relayed to plaintiff or his attorney. Additionally, Mr. Willie Johnson, a civil and structural engineering consultant, testified that he was retained by the Board in August 1993 to give an opinion as to whether the unconnected drain line was the cause of the damage to plaintiff's building.
The trial judge assessed the evidence and obviously concluded that the Board acknowledged responsibility at least through August of 1993. We cannot say that determination was error. Furthermore, irrespective of whether the Board first denied responsibility in May 1993 or September 1993, the suit filed in November 1993 was timely.
In Turner v. Willow Tree Townhomes Partnership, 533 So.2d 107 (La.App. 4th Cir. 1988), writ denied, 535 So.2d 743 (La.1989), a plaintiff filed suit against a homestead and other defendants alleging their joint liability for damages suffered as a result of the defective condition of a townhouse purchased by her from the homestead in January 1984. She first experienced water damage in March 1984 and contacted a representative of the homestead who promised to have the problem fixed. The problem was not properly repaired and in March 1985, plaintiff learned from an inspector she had hired that the water problem was due to improper bracing of the bathtub during construction of the townhouses. Because she did not file suit until April 1986, the defendant homestead argued that her delictual action was barred by one year liberative prescription.
This court found that prescription was interrupted when a representative from the homestead inspected the townhouse in December 1985 and convinced plaintiff's son that repairs would be made. The court found that this was enough evidence to show that the homestead acknowledged plaintiff's right against it thereby interrupting prescription and rendering plaintiff's suit against the homestead timely.
Likewise, in this case, the Board's acknowledgment of responsibility for the damage to plaintiff's building through August 1993 interrupted prescription through that date. The suit filed in November 1993 was timely.

CAUSATION:
Next, the Board argues that there was no showing of any causal connection between the faulty drain connection and the damage to plaintiff's building. In support of that argument the Board relies on factual conclusions such as the size of the washed out area which it contends extended only two feet beneath the sidewalk, as well as the fact that other areas of the building besides the facade also settled. The Board contends that the problem of the facade antedated the discovery of the drain problem and was due to normal subsidence in the area.
Plaintiff supported his position with the testimony of three experts who all concluded that the constant diversion of water into the soil caused the pilaster nearest the washout to subside substantially more than the others. Steven Quarls, an expert in the field of architecture, testified that he was present at the May 30, 1992 excavation by the Board of the street next to plaintiff's building. Mr. Quarls saw that the connection had not been made from plaintiff's horizontal drain line to the main drain line running under the street.[4] He stated that there was no soil in the area beneath the sidewalk. He could not see if the cave-like area extended all the way *1057 to the building because of a water meter encased in the brick work which blocked the view to the building.
Quarls stated that the drain line (horizontal) was full of mud which prevented the flow of water into the main drain line. He testified that the cover on the catch basin into which the downspout flowed was welded shut.
George Hopkins, Jr., an expert in the field of architecture and engineering, testified that he was retained by plaintiff in 1989 to perform repairs to the building in question. On February 20, 1992, he became aware of an open hole between the sidewalk and street and a washout under the sidewalk. He explained that the main drain line running under the street was not connected to the horizontal drain coming from the building and that the horizontal line was clogged with dirt. He explained that water coming down the downspout and entering the catch basin had no place to go because the catch basin cover plate was welded shut. As a result, the water escaped where the top of the catch basin joins the underside of the sidewalk and then the water migrated under the sidewalk to the curb line and oozed out into the street between the curb stops. This eventually caused the curb stone to drop down. He said that water continued to flow out in that same path to the street and poured out underneath the sidewalk until it eroded a cavity around the collector box. Because the cover plate was welded shut, the result was several hundred pounds of water pressure moving out between the brick and the sidewalk to the curb which gradually undermined the sidewalk.
Hopkins stated that the pilaster which dropped one and one-half inches did so because of the erosion of the foundation from the water. He testified that this particular pilaster dropped much more than the other pilasters on Chartres Street. He stated that the pilaster which dropped more than the others was less than three feet from the cover plate and was in the area where all of the erosion occurred. Hopkins' opinion is that the dropping of this pilaster was consistent with the the cracking in the building's facade and structure. He opined that the dropping of the pilaster was due to the washout and not from general subsidence in the area.
Hopkins explained that the facade of this building is free-standing without connection to the interior walls of the building and is supported by approximately ten pilasters. Of those ten, the one in the area of the washout dropped down dramatically more than the other pilasters. Because the facade is not connected to the building in that area and is supported by pilasters, Hopkins stated that there is no relationship between the settlement of the party wall dividing the building and the facade. Additionally, once the Board filled in the washout and properly connected the drain lines, there was no further subsidence.
Walter Blessey, an expert in civil engineering and surveying, testified that he reviewed elevations taken before and after the Board filled in the cave beneath the sidewalk next to plaintiff's building. He stated that he agreed with Mr. Hopkins' explanation of how the washout occurred and what effect it had on the building. Blessey said that the welding down of the catch basin cover prevented the normal escape of significant amounts of water pressure. He stated that the more substantial dropping down of the pilaster beneath the damaged part of the building facade was unrelated to normal subsidence in the area. His opinion is that the extent of this washout was the dominant factor in the greater dropping down of the pilaster at issue. Blessey said the washout was so substantial that it posed a risk that this particular pilaster could not support the load of the facade.
The trial judge's decision to accept the testimony presented by plaintiff's experts was a reasonable credibility determination. We find no error in that determination. The court's conclusion that the Board's failure to properly connect the drain line was the cause of the damage to plaintiff's building is not clearly wrong.

ARTICLE 2317:
The Board argues that it cannot be responsible under article 2317 because it did not have notice of the defect, citing La.R.S. *1058 9:2800. Pretermitting the fact that liability was imposed by the trial court under both negligence (article 2316) as well as strict liability theories, the Board's argument has no merit.
The knowledge required under R.S. 9:2800 can be actual or constructive. Constructive notice is defined as the existence of facts which infer actual knowledge. R.S. 9:2800C. Steven Quarls, the architect present at the May 30, 1992 excavation, testified that the wash out or "cave" under the sidewalk was large and directly observable. George Hopkins, Jr., the lead architect hired by plaintiff for repairs to the building, testified that he personally observed the washout below the sidewalk in February, 1992 and described it as a hole large enough for a man to get into. Marilyn Magendie, a Board claims investigator who was present at the May 30, 1992 excavation, testified that she observed a slight cave or depression in the street where the street meets the curb although she claimed the cave was much smaller than described by Mr. Quarls and Mr. Hopkins. She denied that the cave was large enough to be classified as a washout. A written report of the Board's emergency inspector, James Rivers, shows that he responded to a complaint about a cave under the street in this area on April 6, 1992 and reported that he found a cave by the meter. Mr. Rivers did not testify at trial.
The evidence presented was sufficient to show that the Board had constructive knowledge of the defect which caused the damage to plaintiff's building. The Board argument to the contrary is without merit.

REQUEST FOR ADMISSIONS:
The Board argues that the trial court erred in deeming admitted those facts contained in plaintiff's request for admissions. Plaintiff forwarded a request for admissions to Board counsel George Simno on November 30, 1994, in accordance with the provisions of LSA-C.C.P. art. 1466. Mr. Simno did not respond to the request within the delays allowed by LSA-C.C.P. art. 1467. On February 1, 1995, over sixty days after plaintiff's request for admissions was served on Mr. Simno, another Board attorney, Mary Elizabeth Paltron, sent plaintiff's attorney a response to the request for admissions which she claimed she did not receive until January 20, 1995. Plaintiff's counsel advised Ms. Paltron that the request for admissions was properly served on another Board attorney and her response was not timely. Plaintiff's counsel also advised that he would seek to have the matters contained in the request for admissions deemed admitted due to the failure of defense counsel to timely respond.
The Board attempted to file its response to the plaintiff's request for admissions on February 3, 1995 but the Clerk of Court's office for the Civil District Court refused to accept the filing of the response. Counsel for the Board filed a motion asking the trial court to accept the filing of the response and recognize that there was a response to the request for admissions.
At the beginning of trial, attorneys for plaintiff and the Board presented arguments on the issue of whether the request for admissions should be deemed admitted due to the Board's failure to timely respond. The Board attorney did not deny that the response was late but argued that it should be accepted because it addressed the same issues denied or responded to in other pleadings in the case. The trial judge ruled that the request for admissions was not responded to in a timely fashion and ordered that the request be deemed admitted. The matters deemed admitted included that the Board was responsible for the proper connection of the subsurface drainage connection to the main drain line below the street at 812-818 Chartres Street and that these lines were not properly connected prior to May 30, 1992.
We find no error in the trial court's ruling. Failure to timely answer a request for admissions results in the matters in which admissions are requested being deemed admitted. LSA-C.C.P. art. 1467; Davis v. Westinghouse Electric Corporation, 526 So.2d 337 (La.App. 4th Cir.1988).
Considering the undisputed fact that the drain line from plaintiff's building was not connected to the main line, the expert opinions that the unconnected line caused the unusual subsidence under plaintiff's building, and the board's admission of responsibility *1059 both in testimony and the untimely response to the request for admissions, we find no trial court error and affirm the judgment.
AFFIRMED.
NOTES
[1] The testimony in this record sometimes refers to the drain coming from the roof as a down pipe or merely drain pipe. For clarity we will refer to it as a downspout.
[2] Plaintiff's building is four stories. The downspout or drain collects the rainwater from the roof and diverts it to the subsurface drain line which was supposed to be connected to the Board's main line under the street. The clean out referred to in testimony was between the building and the street. The drain line first went into the clean out, then flowed to the main line.
[3] Frank Davis, the Board's supervisor, did not testify at trial. However, plaintiff's attorney, James Selman, testified from notes he took at the excavation site. He stated that Davis acknowledged that the problem was the Board's.
[4] The downspout drained into a catch basin which flowed into a horizontal line which was supposed to be connected to the subsurface drain running under the street. At times, the testimony does not make this clear.