696 So.2d 120 (1997)
Rosemary NIKLAUS
v.
Joseph H. BELLINA, M.D., et al.
No. 96-CA-2411.
Court of Appeal of Louisiana, Fourth Circuit.
May 21, 1997.
Rehearing Denied July 15, 1997.
*121 Leonard A. Washofsky, Metairie, and Bernard E. Burk, New Orleans, for Appellant.
Harold A. Thomas, Thomas, Hayes and Buckley, L.L.P., New Orleans, for Appellees.
Before LOBRANO, ARMSTRONG and LANDRIEU, JJ.
LOBRANO, Judge.
This appeal arises from a judgment in favor of defendant, Dr. Joseph H. Bellina and against plaintiff, Rosemary Niklaus, dismissing her cause of action against Dr. Bellina for medical battery.
The facts and procedural history precipitating this judgment are as follows:
Sometime in 1983, Niklaus, a resident of New Jersey, saw Dr. Bellina on a nationally syndicated television show. Dr. Bellina was a guest speaker and was represented as an expert in the field of laser microsurgery. Niklaus contacted Dr. Bellina via telephone and informed him that she suffered with a fibroid tumor of the uterus which had been enlarging for the past 5 to 10 years. She inquired about possible surgery.
Following a telephone consultation between Dr. Bellina and Niklaus' private physician, arrangements were made for Niklaus to travel to New Orleans. Upon arrival, Niklaus was interviewed and examined by Dr. Bellina. She expressed a desire to have the tumor removed via a laser myomectomy (removal of the tumor in the uterine wall) while preserving her uterus. Dr. Bellina noted Niklaus' request and took a complete history.
After further examination, Dr. Bellina informed Niklaus that the tumor was quite large, but that if possible he would try to remove it while preserving her uterus. Niklaus signed the appropriate consent forms in which she limited Dr. Bellina to a bikini-type incision for the surgery.
Due to severe anemia, the surgery was delayed in order to administer four units of blood to Niklaus. After Dr. Bellina discussed the possibility that a hysterectomy may be necessary, an additional consent was obtained allowing Niklaus' brother, General Ralph V. LoCurcio, to view the operation and give additional consent for surgical procedures (such as a hysterectomy) which may be necessary in the event of a life threatening situation.
Surgery was performed on October 19, 1983. A massive tumor was found. Dr. Bellina determined that the tumor, which had engulfed the uterus, ovaries, and fallopian tubes and had attached to other organs, could not be removed without performing a complete hysterectomy. At all times during the surgery, Dr. Bellina, via audio and video means, was in communication with General LoCurcio. The hysterectomy was performed and the tumor removed. The tumor was large enough to simulate a seven month pregnancy and was compared with the size of a football.
Subsequently, Niklaus filed a claim against Dr. Bellina with a medical review panel, asserting that he performed the hysterectomy without her consent and therefore committed *122 a medical battery upon her.[1] On December 17, 1985, the panel rendered its opinion finding that the evidence did not support the conclusion that Dr. Bellina "failed to meet the applicable standard of care as charged in the complaint."
Niklaus filed suit in Civil District Court on January 29, 1986 against Dr. Bellina, and Louisiana Medical Insurance Company, his insurer, alleging that he committed medical malpractice (paragraph II) and an intentional tort of battery (paragraph XV).[2] Niklaus asserted that at all times her agreement with Dr. Bellina was for a laser myomectomy only and not for a hysterectomy.
Following trial, the jury found in favor of Dr. Bellina. Niklaus argues that, over her objections, the trial court insisted "upon instructing the jury with regard to the law of medical malpractice, medical negligence, and informed consent, when in fact this case presented as its only issue of liability, a medical battery." "Thus, this medical battery case never went to the jury for a finding of fact as to whether medical battery was committed. The jury was then precluded from determining the only issue of liability tried to it."
Niklaus appeals the trial court judgment asserting twelve assignments of error.
Niklaus' first eleven assignments of error are to the effect that the trial court improperly instructed the jury on the law of medical malpractice while refusing to instruct the jury on the law of medical battery, her real cause of action against Dr. Bellina. Her last assignment of error is to the effect that the trial court refused to allow the jury to answer interrogatory No. 4 relative to whether Dr. Bellina committed medical battery. Niklaus contends that these errors require reversal of the jury verdict and a de novo review by this court.
In this Court, Dr. Bellina has filed an exception of prescription asserting that Niklaus' claim for medical battery is prescribed for failure to file within the one year prescriptive period. La. C.C. article 3492. Specifically, he argues that medical battery, an intentional tort, falls outside the provisions of the medical malpractice act and thus the prescriptive toll was not suspended while the matter was pending before the review panel. In support Dr. Bellina cites Baham v. Medical Center of Louisiana at New Orleans, 95-2605 (La.App. 4th Cir. 5/8/96), 674 So.2d 458, 462, n. 3. The surgery was performed on October 19, 1983 and suit was filed more than a year later, on January 29, 1986.
In response, Niklaus concedes that the intentional tort of medical battery is not covered by the Act. However, she argues that in an abundance of caution she submitted her claim to the medical review panel as was the generally accepted practice in 1984. At that time, argues Niklaus, all claims against a qualified health care provider were first brought before a medical review panel. This fact, coupled with Dr. Bellina's failure to assert, before the review panel, that the claim was not subject to the provisions of the Act, served to interrupt prescription. We find merit in this argument.
Prescription statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished. Doskey v. Hebert, 93-1564, (La.App. 4th Cir. 9/29/94), 645 So.2d 674, 679. Thus, of two possible interpretations, that which favors maintaining, as opposed to barring, an action should be adopted. Foster v. Breaux, 263 La. 1112, 270 So.2d 526, 529 (La.1972).
An action in tort prescribes in one year. La. C.C. Art. 3492. An exceptor pleading the limitation ordinarily bears the burden of proof. Langlinais v. Guillotte, 407 So.2d 1215, 1216 (La.1981). However, where the petition on its face reveals prescription has run, the responsibility shifts to the plaintiff to show otherwise. Lima v. Schmidt, 595 So.2d 624, 628 (La.1992).
Niklaus bears the burden of showing interruption since her petition was filed more than a year after the surgery. She relies on interruption by acknowledgement. *123 "Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe." La. C.C. art. 3464. Interruption by acknowledgement may be oral, in writing, formal, informal, express or tacit. Huger v. Sewerage and Water Board. 95-2261 (La.App. 4th Cir. 3/27/96), 672 So.2d 1053, 1055, writ denied, 96-1034 (La.5/31/96), 674 So.2d 264. "A tacit acknowledgment occurs when a debtor performs acts of reparation or indemnity, makes an unconditional offer or payment, or lulls the creditor into believing he will not contest liability." Lima, 595 So.2d at 634. (emphasis added).
It is undisputed that Dr. Bellina never objected to plaintiff proceeding before the review panel, nor did he complain to the panel about their authority to proceed. In fact, he defended the claim on its merits before the review panel. These actions or inactions bolster plaintiff's assertion that in 1984 all claims against qualified health care providers were submitted to review panels. Although Dr. Bellina never implied or suggested that he would not contest liability, by analogy to that principle, we conclude his failure to object to the plaintiff proceeding before the review panel was a tacit acknowledgement of the procedure and served to interrupt prescription. In a sense, it served to "lull" Niklaus into the belief that there was no objection to first proceeding before the review panel. We hold that the prescriptive toll on Niklaus' claim was interrupted when it was accepted for consideration by the review panel without Dr. Bellina's objection. The liberal interpretation of the prescriptive rules requires this result and we, therefore, deny the exception of prescription. However we limit our finding of interruption by acknowledgment to the peculiar facts and circumstances of this case.

JURY INSTRUCTIONS AND INTERROGATORIES:
Niklaus complains that the jury instructions were both misleading and confusing because they focused on medical malpractice, rather than medical battery. We have reviewed those instructions, and while they sufficiently charge the jury on medical battery,[3] we recognize that the thrust of the charges are medical malpractice. Whether the totality of the instructions sufficiently confused the jury so as to preclude a verdict based on the law and facts is difficult to determine. Regardless, our determination of that issue is not necessary because we do find the interrogatories to be misleading and confusing.
When the jury reached its verdict, the following interrogatories had been answered.
Has plaintiff proved the degree of knowledge or skill possessed, degree of care ordinarily exercised by physicians practicing gynecological surgery?
Answer: Yes.
Did Dr. Bellina deviate from the standard of care in the medical service he rendered to Rosemary Niklaus?
Answer: No.
*124 The interrogatories then instructed that if the answer to number two was "no", no further answers were required. As a result, no other interrogatories were answered.[4] Niklaus argues that the jury was effectively precluded from considering plaintiff's case against Dr. Bellina for medical battery, which does not require the same burden of proof as malpractice. We find merit in this argument.
Where the trial court submits a verdict sheet which either confuses or misleads the jury, such interrogatories may constitute reversible error, and thus the "manifest error" standard of appellate review is ignored. Marks v. Louisiana Farm Bureau Casualty Ins. Co., 556 So.2d 949, 952 (La.App. 3rd Cir.1990). In the instant case, the jury was never asked to decide if Dr. Bellina, given the evidence presented, committed medical battery when he performed the hysterectomy. It is impossible to surmise what the jury response would have been. However, since medical battery is a cause of action separate and distinct from malpractice requiring different elements and proof, the verdict sheet was defective by instructing the jury not to proceed further. Thus, because the jury never decided the medical battery claim, we review the record de novo pursuant to our constitutional authority to review facts. Gonzales v. Xerox, 320 So.2d 163 (La. 1975). To the extent that any factual findings of the jury might be relevant to our determination of whether a medical battery was committed, we give them no weight whatsoever.

Testimony adduced at trial:
The plaintiff, Rosemary Niklaus testified that in 1966 she underwent a myomectomy to remove a fibroid tumor. By 1972 the tumor had grown back. In 1983 she contacted Dr. Bellina in the hopes that he could remove this tumor via the use of laser surgery and save her uterus. She explained to Dr. Bellina that she did not want a hysterectomy.
On October 12, 1983, Niklaus came to New Orleans and was examined by Dr. Bellina. At that time he explained to her how he would use the laser to cut away the tumor leaving the reproductive organs. According to Niklaus, Dr. Bellina never told her that he would have to perform a hysterectomy.
Niklaus' myomectomy was initially scheduled for October 13, 1983. However, it was postponed because she was anemic and displayed symptoms of peripheral vascular resistance. She was given the option to return home or have blood transfusions to build up her strength. She opted for the transfusions. The surgery was then rescheduled for October 19, 1983. She testified that she signed the consent to perform the operation only after Dr. Bellina assured her that he would not perform a hysterectomy. She instructed her brother not to consent to any operation but a myomectomy unless "I was about to die that second."
After the hysterectomy was performed, she became very depressed and upset. She saw Dr. Bellina four days later. He told her he had to perform a hysterectomy because the tumor was large and very involved with the reproductive organs. She acknowledged that Dr. Bellina may have told her he had to perform a hysterectomy to save her life. However, she did not recall him telling her that she was hemorrhaging or that he feared an embolism.
Brigadier General Ralph V. LoCurcio[5] testified that his sister (Niklaus) told him she was going to allow Dr. Bellina to perform laser surgery because she did not want a hysterectomy. According to LoCurcio, his sister's tumor was large and obvious. Her abdomen was quite enlarged. He testified that his sister did not want a hysterectomy because she did not want to supplement her body with artificial estrogen which could subject her to breast cancer, premature change of life and other complications.
General LoCurcio did not meet with Dr. Bellina prior to the surgery. However, on *125 the day before the surgery, Niklaus signed a consent form giving him the authority to decide in any change of procedure. She underlined the word "only" meaning only a myomectomy was authorized except under extreme emergency circumstances if her life was threatened. During the operation, General LoCurcio and Dr. Bellina were in communication via audio and video connection with General LoCurcio sitting in a separate room from the operating room.
During the initial stages of the surgery, Dr. Bellina held the tumor in his hand and showed it to him. Dr. Bellina related to LoCurcio that the tumor was involved with other organs and that he would try to cut it out. LoCurcio did not see the tumor again until he saw it in the bottom of the surgical pail in the operating room. LoCurcio stated he never saw the laser used during the surgery. He did see Dr. Bellina use scissors to cut behind the tumor. Dr. Bellina told him he could not use the laser.
He also remembered Dr. Bellina saying "This is much larger than I had expected. There is a considerable amount of involvement with other organs and it is a very tough job. I am sweating." Dr. Bellina told him that a laser was inappropriate and that what he needed was a "buzz saw to remove this thing." The tumor was so large that Dr. Bellina told him that using a laser would be like using a hacksaw to cut down a redwood. Dr. Bellina told him the tumor weighed around fifteen pounds and was "like a bunch of rocks glued together."
LoCurcio became concerned that Dr. Bellina was departing from the myomectomy. He began to ask various questions about the size and consistency of the tumor and how involved it was with the other organs, although he never asked if Dr. Bellina was going to perform a hysterectomy. Dr. Bellina responded to his inquiries by stating that there was no uterus, only tumor and that the blood vessels that were involved in the tumor were consuming one-half of the body's blood supply. Dr. Bellina explained that he was trying to isolate the blood supply to the organs so that he could clamp them and remove the tumor. It was at this point that he began to believe Dr. Bellina was going to perform a hysterectomy.
General LoCurcio did not attempt to intervene or try to stop Dr. Bellina from performing a hysterectomy. He felt like stopping him but didn't because he believed to do so would endanger his sister's life. He felt it was not within his power to stop Dr. Bellina. He testified that he is an engineer, not a doctor, and felt he could not tell Dr. Bellina how to "prosecute his business."
LoCurcio stated that Dr. Bellina indicated that he was going to remove the uterus about two-thirds of the way into the operation, but never sought his permission. After the surgery, the witness viewed the tumor in the surgical pail which he described as the size of two softballs and weighed between eight and ten pounds.
On rebuttal, General LoCurcio presented live testimony to the effect that he only came to the operating room once and then only to see the tumor in the pail. He claimed that he never spoke face to face with Dr. Bellina about the necessity of performing the hysterectomy or that Niklaus' life was in danger from hemorrhaging.
Dr. Gary Steinman testified on behalf of the plaintiff via deposition taken on February 2, 1996. He is an obstetrician and gynecologist from New York. Dr. Steinman was not recognized as an expert because he was not experienced with the use of a laser in performing myomectomies. However, he was permitted to testify and the jury was free to weigh that testimony accordingly.[6]
Dr. Steinman testified that the pre-operative tests indicated that Niklaus had mitral valve prolapse which necessitated blood transfusions prior to surgery. According to Steinman the operative report does not reflect that Dr. Bellina used the laser during her surgery, but indicates that Niklaus' fallopian tubes and ovaries were "completely distorted."
*126 Dr. Steinman opined that there was a point when Dr. Bellina could have stopped the surgery without removing the uterus. He testified that he was unaware of any literature that substantiates the position that stopping the surgery could cause an embolism (blood clot). According to Steinman, the possibility of Niklaus suffering an embolism was speculative unless Dr. Bellina observed injury to a blood vessel from either disease or trauma.
Dr. Steinman stated that there is nothing in the operative report to indicate that Niklaus was hemorrhaging or in any life threatening situation. The report showed that her red blood cell count was low but he opined that her blood volume could have been normal. Furthermore, Dr. Steinman found that the pathology report indicated a functioning endometrium and ovaries which proved that Niklaus still had menstrual cycles.
On cross examination, Dr. Steinman admitted that Niklaus' serum iron level was very low which is an indication of chronic bleeding. In addition, he acknowledged that the operative report shows that Niklaus lost 1500 to 2000 cc's of blood mostly in the uterus and that she was given three units of packed cells during surgery which also indicates chronic bleeding. He admitted that if he had exteriorized an eight to ten pound tumor which was involved with various organs that he would not have stopped the surgery. He opined that this would not be good medicine. He stated that it would be almost impossible to return the tumor to the abdominal cavity because it would have displaced the bowels.
He agreed that such a large tumor could have caused bowel obstructions, kidney obstructions and pressure on the liver. He admitted that Dr. Bellina was in a better position to know if he could have stopped the surgery than a physician testifying from an operative report. Because he was not experienced in laser surgery, Dr. Steinman deferred to Dr. Bellina's judgment as to whether the laser could have been used to remove the tumor. Dr. Steinman also admitted that while the pathology report showed uterine tissue present in the tumor, no discernible uterus was indicated.
Dr. James W. Bohm, obstetrician/gynecologist and member of the medical review panel that found in favor of Dr. Bellina, testified that all that Dr. Bellina could have determined from an ultrasound was the size of the tumor and not how involved it may or may not be with the other organs. He explained that a pedunculated tumor is easily removed because it is attached by a single stalk. A parasitic tumor engulfs and grows into the organs around it. These tumors take their nourishment from the person's blood supply, causing anemia. In Niklaus' case, the parasitic tumor engulfed all of the reproductive organs and the bowel as well.
Dr. Bohm testified that because the tumor was parasitic, Dr. Bellina could not know if he could use the laser to remove it until after he exteriorized it. Once Dr. Bellina exteriorized the tumor, he had no choice but to remove it. If Dr. Bellina had returned the tumor to the body cavity and stopped the surgery, the tumor would have died causing an acute medical emergency. According to Dr. Bohm, Niklaus' situation was definitely life threatening.
Dr. Bennie Nobles, obstetrician/gynecologist, was also a member of the medical review panel. He testified that he is very familiar with laser surgery and had performed laser myomectomies. He testified that Dr. Bellina's preoperative tests and examination could only indicate the approximate size of the tumor and not whether it was pedunculated or not. How it was attached could only be determined by exploring the tumor. Dr. Nobles described Niklaus' tumor as very vascular. This, coupled with its size and how it was attached to the various organs, made it very difficult to remove. It replaced the whole of the uterus and filled the entire pelvis. It consisted of one large mass with no margins between it and the uterus and other organs. Dr. Nobles testified that it would have been foolhardy to use the laser. To return the exteriorized tumor and stop the surgery would have jeopardized Niklaus' health and life. Stopping the surgery could have caused hemorrhaging, infection and sepsis (blood poisoning). Dr. Nobles stated that there was no way to save Niklaus' organs.
*127 Dr. Bellina testified that when he first examined Niklaus he was shocked at the size of the tumor. He admitted that Niklaus stated that she did not want a hysterectomy. Her pre-operative tests showed that she was very anemic. She was given four units of blood prior to surgery. When questioned about the necessity of giving Niklaus transfusions, Dr. Bellina stated that if she had not required the blood, the transfusions would have caused an overload of her system causing heart failure.
Dr. Bellina testified that what he found during the surgery was unforeseen and presented a life threatening situation. The tumor had so engulfed the other organs that part of Niklaus' bladder was pulled off during the procedure. The tumor also engulfed the bowel. He testified that if he had left the tumor inside Niklaus and stopped the surgery, bleeding and possible bowel obstruction could have followed.
Dr. Bellina was adamant about the fact that he spoke to General LoCurcio twice during the operation. The first time the General came to the door of the operating room, Dr. Bellina testified that he told him that he could not save the uterus. The tumor was connected to the bladder, rectal sigmoids, large bowel and the liver. There were numerous swollen blood vessels. It was one mass of tissue. Since he could not discern a definable uterus, Dr. Bellina testified that he had no choice but to perform the hysterectomy.
Judith Schiro, the registered nurse anesthetist who was present during the surgery testified that she remembers Niklaus because she was one of the patients that was almost lost during surgery. Schiro testified that she was extremely worried that Niklaus would hemorrhage during the surgery. Niklaus' hemoglobin had dropped to dangerously low levels prior to surgery, and blood transfusions were necessary to raise the level to normal to insure Niklaus would not go into shock. Schiro stated that prior to surgery Niklaus was given four units of blood and three additional units during surgery. Each unit of blood equals 450 c.c.'s. Given her weight, Niklaus' total blood volume equalled approximately 3800 c.c.'s. Niklaus was given 3500 c.c.'s prior to and during surgery. Schiro stated that almost all of Niklaus' total blood volume was replaced. During surgery Niklaus' vital signs became unstable from the loss of blood. Various measures were taken to increase her blood pressure to prevent shock. Schiro believed that the operation became life threatening and that Niklaus would have died if the hysterectomy had not been performed.
Schiro also opined that Niklaus was at a higher risk for embolism. She explained that tumors slow down blood flow from the legs to the heart due to pressure on the aorta and vena cava. The slower the blood flow, the greater the risk of clotting.
Schiro testified that General LoCurcio came to the operating room door on two occasions. The first time he came he spoke to Dr. Bellina. While Schiro could not hear the content of that conversation, nothing indicated that General LoCurcio requested that Dr. Bellina not proceed with the surgery. The second time he came to the door of the operating room was to view the tumor in the bucket.

ANALYSIS:
Plaintiff's claim is not one of negligence or malpractice, but one of medical battery. Specifically, plaintiff argues that she consented to a laser myomectomy and not a hysterectomy. In Baham v. Medical Center of Louisiana at New Orleans, 674 So.2d at 461, we distinguished medical battery from medical malpractice as follows:
Where the patient consents to operation A and the health care provider instead performs operation B, that is not medical malpractice, but is rather the intentional tort of medical battery and is not covered by the Medical Malpractice Act. [citations omitted].
The initial consent given by Niklaus provides that Dr. Bellina is authorized to perform a "myomectomy by bikini cut and/or to do any other therapeutic procedure that (his) (their) judgment may dictate to be advisable for the patient's well-being, whether or not arising from presently unforeseen conditions." The subsequent "Audio Visual Consent" provides that Niklaus' brother is authorized *128 to give consent to additional surgical procedures "only if a life threating [sic] situation exists." (emphasis in original).
The only reasonable interpretation of Niklaus' consent is that, in a critical situation, Dr. Bellina was authorized to perform whatever procedures he deemed necessary, including a hysterectomy. After review of the evidence, we conclude it preponderates in Dr. Bellina's favor. We are satisfied that he had no alternative under the circumstances except to remove the uterus and thus that procedure did not result in a medical battery on Niklaus.[7]
Dr. Bellina began the operation as a laser myomectomy. Once he made the initial incision and exteriorized the uterus/tumor he was confronted with a parasitic tumor of enormous size and vascularity which engulfed the organs of the pelvic region. It became immediately apparent that the tumor could not be removed without performing a hysterectomy.
Dr. Bellina and Dr. Nobles both testified that once the tumor was exteriorized, the surgery had to proceed even if it meant removing the uterus and other reproductive organs. Even Niklaus' expert, Dr. Steinman, agreed that it would not have been good medicine to stop the surgery. The life threatening situation was further corroborated by Judith Schiro's testimony that Niklaus' vital signs had become unstable from excessive blood loss and measures had to be taken to prevent her from going into shock.
Review of the audio/visual tape suggests that General LoCurcio was fully aware of the extent of the tumor and Dr. Bellina's concern that the uterus could not be saved. General LoCurcio testified that he never requested that Dr. Bellina stop the surgery. In fact, he stated that he felt it would be dangerous to ask him to stop since Dr. Bellina was the expert and the one better able to make the decision if a hysterectomy was warranted to save his sister's life and/or health.
Because we hold Dr. Bellina free of any fault, it is not necessary to discuss, in detail, the effect of a motion to dismiss which he urges dismissed him from these proceedings. Suffice it to say that the order of dismissal, even though erroneously worded, was not intended to dismiss Dr. Bellina.
Accordingly, and for the reasons assigned, the judgment dimissing Dr. Bellina, with prejudice, is affirmed.
AFFIRMED.
NOTES
[1] Her claim was filed in accordance with the provisions of the Medical Malpractice Act. La. R.S. 40:1299.41, et seq.
[2] There were other named defendants, but they were all voluntarily dismissed. The matter proceeded against Dr. Bellina.
[3] The pertinent instructions provided:

"A surgeon commits a battery on a case [sic] when he undertakes a particular surgical procedure without consent of the patient or person authorized by law to consent for the patient except when an emergency requires immediate surgery for the preservation of life or health under circumstances when such consent cannot be practically obtained. An emergency is a situation wherein, one, in competent medical judgment the proposed surgical or medical treatment procedures are reasonably necessary; and two, a person authorized to consent is not readily available and any delay in treatment could reasonably be expected to jeopardize the life and health of the patient or could reasonably result in disfigurement to or the impairment of the faculties of the patient. An unauthorized operation that is skillfully performed nevertheless constitutes a battery.
The general rule prohibiting the performance of an operation without the consent of the patient or someone authorized to consent for the patient extends to the performance of operations different in nature from that for which consent was given and to operations involving risks and results not contemplated.
A physician owes his patient the duty to provide the patient with sufficient information to permit the patient herself to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternative method of treatmentmethods."
[4] Interrogatory No. 4 asks, "Did Dr. Bellina committed [sic] a battery upon Rosemary Niklaus by performing an operation without her consent, implied or actual?"
[5] Brigadier General Ralph LoCurcio testified via deposition taken on December 21, 1987. At the time of his deposition he held the rank of Colonel.
[6] Since we are dealing with a medical battery as opposed to medical malpractice, we consider his testimony with that distinction in mind.
[7] Even without consideration of the language in the consent forms, our Supreme Court has held that consent is implied when a situation seriously threatens the health or life of the patient. Pizzalotto, M.D., Ltd. v. Wilson, 437 So.2d 859 (La. 1983).