703 So.2d 821 (1997)
August PEREZ, III
v.
Margaret A. SHOOK, et al.
No. 97-CA-0420.
Court of Appeal of Louisiana, Fourth Circuit.
December 3, 1997.
*822 Robert S. Abdalian, Abdalian Law Firm, New Orleans, for Plaintiff/Appellant.
R. Patrick Vance, Virginia W. Gundlach, Timothy S. Cragin, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans; W.K. Christovich, Daniel A. Rees, Christovich & Kearney, L.L.P., New Orleans; Frederick R. Bott, Nancy Jane Marshall, Deutsch, Kerrigan & Stiles, L.L.P., New Orleans, for Defendants/Appellees.
Before LOBRANO, ARMSTRONG and JONES, JJ.
JONES, Judge.
On September 3, 1993, the plaintiff, August Perez, III, filed this malpractice suit against the defendants Margaret Shook, Douglas Draper, Douglas Draper, A Professional Corporation; Gordon F. Wilson, Jr., Gordon F. Wilson, Jr., A Professional Corporation, and ABC Insurance Company alleging that the defendants breached their professional duties to him in a 1987 bankruptcy proceeding in which Perez was denied discharge of his *823 financial debts. The defendants moved to dismiss on the ground that Perez's claim had prescribed on its face. In defense, Perez argued that the prescriptive period on his legal malpractice claim was suspended under the continuous representation doctrine because the defendants continued to represent him until he discharged them on September 3, 1993. After a bench trial on the prescription exception, the district court sustained the defendant's exception and dismissed Perez's legal malpractice claim with prejudice. The plaintiff appealed. This Court reverses in part and affirms in part the trial court's judgment.
FACTUAL BACKGROUND:
August Perez, III ("Perez") is an architect who found himself among the countless individuals and business entities in Louisiana negatively impacted both by the oil recession in the early 1980s and the 1984 Worlds' Fair in New Orleans. In 1986 Perez retained Mr. Gordon Wilson ("Wilson") and the law firm of Friend, Wilson, Spedale & Draper[1] to represent him and his corporations in various legal matters, particularly those legal matters stemming from his financial obligations. Wilson and Mr. Douglas Draper were partners and Ms. Margaret (Shook) Gravolet was an associate in the firm. In July 1987 Perez, in the midst of financial difficulties, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code to obtain a client/debtor discharge. In January 1988 Hibernia Bank, one of Perez's creditors, challenged his entitlement to a discharge in bankruptcy. Hibernia alleged that Perez had engaged in various actions and transactions with the intent to defraud his creditors. On May 30, 1990, after a hearing on the matter, the bankruptcy court denied Perez's discharge holding that: 1) Perez failed to "explain satisfactorily" a change in his personal financial statements from 1985 to 1986 (the 1985 statement listed a number of items of jewelry, furs and household furniture which were omitted from the 1986 statement) in violation of 11 U.S.C. § 727(a)(2)(A); and 2) Perez's distribution of tax refunds, between he and his wife, were made "with intent to hinder, delay, or defraud a creditor... within one year before the filing of the [bankruptcy] petition" in violation of 11 U.S.C. § 727(a)(2)(A). On appeal the United States District Court for the Eastern District of Louisiana upheld the bankruptcy court's finding. Hibernia National Bank v. Perez, 124 B.R. 704 (E.D.La.1991). Perez further appealed to the United States Fifth Circuit Court of Appeals which affirmed the District Court's decision on February 14, 1992. In re Perez, 954 F.2d 1026 (5 Cir.1992).
On September 2, 1993, Perez informed Wilson that he wished to sever and terminate all legal representation by Wilson and his firm. On September 3, 1993, one day later and three years after the 1987 bankruptcy proceeding, Perez filed suit against Margaret Shook, Douglas Draper, Douglas Draper, A Professional Corporation; Gordon F. Wilson, Jr., Gordon F. Wilson, Jr., A Professional Corporation, and ABC Insurance Company alleging that the defendants breached their professional duties to him in the bankruptcy proceeding. The defendants moved to dismiss on the ground that Perez's claim had prescribed on its face. Perez maintained that his cause of action was suspended under the continuous representation doctrine because Wilson and his law firm continued to represent him until he discharged them on September 3, 1993. Perez argued that a finding of continuous representation was supported by the following events: 1) Wilson gave Perez advice concerning "a pending dispute between the trustee of Augie's [Perez's] bankruptcy estate" by letter, dated March 26, 1993; 2) Wilson's incorporation of corporations on behalf of Mr. Perez, even ten days after the Fifth Circuit affirmed the discharge denial and in December 1992; 3) Wilson, beginning in March 1991, and thereafter continuously advised Perez that he could work without pay after the bankruptcy discharge denial and have his wife earn a salary without running afoul of the law; 4) Wilson advised Perez concerning garnishment matters as late as August 11, 1993; 5) Wilson on June 3, 1993, wrote the Hibernia Bank's attorney *824 concerning Mr. Perez's deposition on a PEF garnishment matter, referring to Perez as "my client" in the letter; and 6) Wilson on June 10, 1993, wrote a letter to Mr. and Mrs. Perez concerning whether Mr. Perez could avoid garnishment by working for free.
After a bench trial on the prescription exception, the district court, applying the one year prescriptive period under La.Civ.Code Art. 3492,[2] sustained the defendant's exception and dismissed Perez's claim with prejudice. The court acknowledged that the alleged legal malpractice claim arose out of the 1987 bankruptcy proceedings. However, the court found that Perez knew or should have known of the alleged malpractice no later than February 14, 1992, when the U.S. Fifth Circuit Court of Appeals, in affirming the bankruptcy court's decision, found thatbut for the pre-trial inserts submitted for the pre-trial order on behalf of Perez in the bankruptcy court by the defendant, Wilson, the violation of § 727(a)(2)(A) by Perez would not have become an issue to be decided in bankruptcy court. See In re Perez, 954 F.2d 1026 (5 Cir.1992). Thus, the court reasoned, Perez's September 3, 1993, malpractice suit, brought more than one year after the February 14, 1992, Fifth Circuit decision had prescribed on its face.
The district court then considered Perez's argument that the continuous representation rule had suspended prescription until September 3, 1993, when Wilson was discharged. The court found that the continuous representation rule did indeed apply, but it merely suspended the running of prescription through February 14, 1992, and not September 3, 1993. The court reasoned that any legal services performed by Wilson after the Fifth Circuit's decision on February 14, 1992, were incidental to a "general professional relationship" and not sufficiently related to the bankruptcy proceedings, for purposes of the continuous representation doctrine, to suspend prescription until September 2, 1993, the date of Perez's discharge letter. Furthermore, the court found that all subsequent representation in the bankruptcy proceedingsand in the denial of discharge proceedings was performed solely by Wilson, and not Douglas Draper or Margaret Shook (Gravolet). The court noted that Margaret Shook (Gravolet) was employed by the Wilson's law firm only from April 14, 1986, through August 31, 1989, and only worked on the schedules that were filed with the initial bankruptcy pleadings and had nothing to do whatsoever with the proceedings for the denial of discharge. Similarly, the court found that Douglas Draper only appeared in the bankruptcy proceedings at the time of the initial filing of the schedules and the creditor meetings but did not engage in any subsequent representation.
DISCUSSION:
Standard Of Review
Perez now seeks review of the district court's decision. He does not assign error to the factual findings regarding when he discovered the facts giving rise to his malpractice cause of action, nor does he find error in the court's application of the one year prescriptive period under Article 3492. Perez assigns error to the lower court's ruling that the services performed by the defendants "Wilson and his law firm" subsequent to February 14, 1992, were incident to a "general professional relationship" and did not constitute continuous representation so as to suspend the prescriptive period until September 3, 1993, the date of the discharge letter from Perez to Wilson.
The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. La. Const.1974, Art.V, Sec.10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. See Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's finding will not be upset unless it is manifestly erroneous or *825 clearly wrong. Id. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Id. Perez contends that the application of the facts to the final legal determination should be deemed an issue of law subject to plenary review. We agree. Whether the defendant's representation of Perez after the alleged act of malpractice was sufficient to suspend the prescriptive period under the continuous representation doctrine is a legal question for the reviewing court to decide, without giving deference to the trial court's findings.. See Doane v. Wal-Mart Discount Stores, Inc., 96-CA-2716 (La.App. 4 Cir. 6/25/97), 697 So.2d 309, writ denied, 97-1852 (La.10/17/97), 701 So.2d 1328, citing Green v. City of Thibodaux, 94-1000 (La.App. 1 Cir. 10/6/95), 671 So.2d 399, writ denied, 95-2706 (La.2/28/96), 668 So.2d 366. Therefore, this court reviews de novo the finding of the district court on the issue of continuous representation.

Continuous Representation Doctrine
A claim for legal malpractice is a delictual action subject to a liberative prescription of one year. La.C.C. Art. 3492; Braud v. New England Insurance Co., 576 So.2d 466 (La.1991). In 1990 the legislature enacted LSA-R.S. 9:5605, which set forth a specific statutory provision governing the prescriptive period for legal malpractice. The statute was also amended in 1992. However, as determined in Lima v. Schmidt, 595 So.2d 624 (La.1992), LSA-R.S. 9:5605 is not applicable when the cause of action arises before the effective date of the statute. Id. at 628. Perez alleges that his cause of action in legal malpractice arose during the 1987 bankruptcy proceedings. Since this alleged cause of action arose prior to the 1990 enactment of the LSA-R.S. 9:5605, the one year liberative prescriptive period under Art. 3492, and not LSA-R.S. 9:5605, is applicable.
When, as in this case, the plaintiff's petition on its face reveals that prescription has run, the burden is on the plaintiff to show why the claim has not prescribed. Id. at 628 citing Bock v. Harmon, 526 So.2d 292 (La.App. 3 Cir.1988), writ denied 531 So.2d 275 (La.1988), Emery v. Cabral, 400 So.2d 340 (La.App. 4 Cir.1981), writ denied 405 So.2d 533 (La.1981); Andrus v. Patton, 394 So.2d 714 (La.App. 3 Cir.1981) (collecting cases); Sun Oil Co. v. Tarver, 219 La. 103, 52 So.2d 437 (1951). Although the one year prescriptive period is the general rule for delictual actions, Louisiana courts have historically resorted to the civilian maxim "contra non valentem non currit praescriptio," (meaning prescription does not run against one unable to act), to soften the harshness of the prescriptive statutes by suspending the running of prescription in exceptional circumstances. Lima, 595 So.2d at 631. The doctrine of contra non valentem has been applied in four general situations: 1) where there was some legal cause which prevented the courts or its officers from taking cognizance of or acting on the plaintiff's action; 2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; 3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of the cause of action; and 4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Compeaux v. Plaisance Inspection & Enterprises, Inc., 93-1165 pp. 7-8 (La.App. 1 Cir. 6/24/94), 639 So.2d 434, 438.
Out of the third prong of contra non valentem evolved the doctrine of continuous representation. Lima, 595 So.2d at 630. In Braud v. New England Insurance Co., 576 So.2d 466 (La.1991), the Louisiana Supreme Court recognized that under the continuous representation doctrine the prescriptive period for a legal malpractice action will be suspended "during the attorney's continuous representation of the client regarding the specific subject matter in which the alleged wrongful act or omission occurred." Id. at 468. One year later, in Lima, supra, the Supreme Court elaborated on the continuous representation doctrine. The Lima court reiterated the Braud interpretation of the doctrine and further explained that the doctrine should apply only "where the professional's involvement after the alleged malpractice *826 is for the same or related services and is not merely a continuity of a general professional relationship." Lima, 595 So.2d at 630, citing Succession of Smith v. Kavanaugh, Pierson & Talley, 565 So.2d 990 (La. App. 1st Cir.), writ denied, 567 So.2d 1125 (La.1990). Furthermore, to determine whether continuous representation exist the entire relationship between the attorney and the client must be examined. Id. Termination of the attorney client relationship is not synonymous with a change of counsel, but rather "on-going contacts involving advice or service can constitute representation." Lima, 595 So.2d at 630, Mallen and Smith, Legal Malpractice, § 18.12, p. 121 (3d Ed.1989). It is especially apt in the context of "an ongoing, continuous, developing and dependent relationship between the client and attorney, with the latter seeking to rectify an alleged act of malpractice" Lima at 630 citing Peduto v. Durr, 97 A.D.2d 959, 468 N.Y.S.2d 953, 955 (4th Dept.1983).
The Lima court also explained that the rationale behind this rule is that "[a] plaintiff cannot justly be held to be `sleeping on his rights' when he is relying upon a honored fiduciary relationship." Lima, 595 So.2d at 630 citing Note, Civil Procedure Statute of Limitation Accrual in Attorney Malpractice Actions: Thorpe v. DeMent, 20 Wake Forest L.Rev. 1017, 1038 (1984). In addition, this doctrine "appropriately protects the integrity of the attorney-client relationship and affords the attorney an opportunity to remedy his error (or to establish that there has been no error), while simultaneously preventing the attorney from defeating the client's cause of action through delay." Lima at 630.
The Lima facts supported an application of the continuous representation doctrine, although it was not dispositive to the case. In Lima, the plaintiff sued the defendant, Schmidt, for malpractice in connection with a real estate exchange transaction. The malpractice occurred on July 29, 1983 when Schmidt signed an Act of Exchange on behalf of the plaintiffs. While the Act expressly provided for the assumption of mortgages on the properties transferred by the plaintiffs, it contained no reference to any mortgage on the property to be acquired by the plaintiff when in fact the property was encumbered by a $150,000 collateral mortgage in favor of the First Guaranty Bank of Hammond. Lima at 626-27. In July 1985, the bank commenced executory proceedings on the note and Schmidt was notified. Id. at 627. Thereafter, Schmidt discussed with the plaintiffs steps that would be taken in an attempt to clear the title to the property, and on behalf of the plaintiffs, Schmidt hired and paid another attorney to defend the foreclosure suit. Nevertheless, the foreclosure was successful and the property was sold on June 25, 1987. Thereafter, the plaintiffs retained independent counsel. On August 14, 1987, Schmidt wrote to the plaintiffs advising them that he was negotiating the purchase of the property from the bank, attempting to secure the return of the plaintiff's $12,000 note which had been executed to secure the property, and stated that his intent was to put the plaintiffs back in the original position which they were entitled. Id. The Lima court found that:
Schmidt clearly continued to represent the Limas until June, or at the latest August, 1987. More specially, we find Schmidt's contacts with the Limas, which included discussions regarding steps to attempt to clear title to the property, evidence[d] legal advice or services. Thus, we find that Schmidt's representation was continued by his hiring and paying for another attorney to defend the foreclosure suit, which was not concluded until June 1987. In any event, at the latest, by August 1987, the Limas had retained independent counsel, who represented them adversely to Schmidt. Id.

We find the Supreme Court's reasoning in Lima compelling in our analysis of the facts before us.
An examination of the attorney-client relationship between Perez and Wilson reveals that the continuous representation rule not only suspended the running of prescription through February 14, 1992, but suspended it to September 2, 1993, when Perez discharged Wilson. In 1986 Wilson and his law firm was initially hired to represent Perez and his corporation, and in particular, to *827 assist him in resolving the legal problems stemming from his financial plight. Wilson testified that Perez's "whole [architectural] practice was on an extreme down spiral following the 1984 World's Fair, and the oil patch and the general depression in our city, particularly with respect to architectural matters, and he had a lot of suits against him, an awful lot, and against his corporation... and we were dealing with Hibernia as well as doing all these cases." R.A. Vol. 2 pp. 26-27. On December 22, 1986, Wilson wrote to Perez to thank him for selecting him as his attorney and noted that he looked forward to working with Perez "through the maze of legal problems so that we can get you on a critical path towards dissolving them." This correspondence was tantamount to a letter of engagement to the extent it referenced the fact that Wilson had been hired to assist Perez with his "legal problems." Although this letter is void of any limitations as to the specific scope of legal services Wilson was to provide, Wilson testified that since Perez's whole operations were out of control he sought advice from Douglas Draper of his firm on various courses of action including formal corporate reorganization and restructuring, reorganizing financially in bankruptcy, and personal financial reorganization in bankruptcy under Chapter 7 to resolve Perez's problems. We find that this testimony and the letter from Wilson to Lawrence Rifkin, discussed infra pp. 825-826, suggests that the parties considered various courses of legal actions, which were not limited to bankruptcy, to resolve Perez's legal problems.
In mid-1987 Perez decided to file for Chapter 7 bankruptcy in order to receive a discharge of his debts. In May of 1990, the bankruptcy court denied the discharge and Perez appealed.[3] Thereafter, on March 7, 1991, a conference call was held between Perez, his wife Cheryl, Wilson, Nick Palmer, Perez's attorney in Denver[4], and Lisa Hebert, Perez's accountant, in which they discussed various actions to be taken if a stay on the bankruptcy decision was denied. In pertinent part, the parties discussed the following matters:
Tad Wilson agreed to file a stay [on the bankruptcy decision];
If stay is denied, activate new Colorado company and PANO as of May 1, 1991;
Sell APIII's share of stock in PANO to Walter Ernst and Joe Holt with a voting trust agreement;
Also, have Perez Architects, A.P.C. purchase Walter Ernst's and Joe Holt's stock in the company;
August Perez, III should resign as officer and director of August Perez, III A.P.C. as soon as the stay is lifted;
Change the name of August Perez, III, A.P.C. and Perez Architects, A.P.C. because APIII [Perez] is concerned that someone could seize and/or purchase the stock and continue to operate under his name.
It was decided that a new company in Colorado would be opened instead of changing the name of Perez Interiors to Perez Architects/Interiors. This new corporation would be owned 100% by Cheryl Perez, would be named Perez Architects/Interiors, A.P.C. and would be an S-Corporation. August Perez, III would be President and not take a salary.
* * * * * *
All agreed that none of those items listed here IRA withdrawals, SS receipts, allowance for personal expenses can be garnished.
* * * * * *
All judgments are processed/collected on a 1st come, 1st served basis. The first creditor to garnish must reserve his right to the garnishment every 90 days. When *828 the first garnishment is complete the next creditor in line with a judgment steps in. Nick warned us to be sure to answer garnishment interrogatories in a timely manner.
* * * * * *
APIII [Perez] is to close all his personal and family accounts when the stay is lifted. He will use whatever monies are in the account at the time the stay is lifted to pay expenses. All in agreement.
It was agreed by all that Cheryl could pay all of APIII's personal expenses and give him an allowance. Nick warned that we should not pay any personal expenses from a corporate account.
* * * * * *
In July of 1991, while awaiting the Fifth Circuit decision, Wilson wrote to Lawrence Rifkin, of the Virginia bar, noting that he was "optimistic about our chances [on appeal of the discharge denial to the Fifth Circuit]... and if we don't succeed, we have some good strategies which will enable Mr. Perez to continue in business as usual which I will be glad to discuss further with you." Emphasis added. Perez argued that this letter indicates Wilson was simply expressing his intention to continue his work to resolve Perez's debt and financial problems, and remedy the negative results of the bankruptcy proceedings. This Court agrees that this letter, in conjunction with Wilson's testimony regarding Perez's available courses of action, the March 7th conference call, and Wilson's actions after the Fifth Circuit decision (discussed, infra) support a finding that Wilson's intent was to continue his relationship with Perez if and when he was not successful in bankruptcy, and to remedy any negative impact that a denial of discharge would have.
Wilson argued that the March 7th conference call was moot because the stay was granted and continued through the Fifth Circuit proceeding; hence, the plan was only to go into effect if the stay was denied, and since it was not, the plan was moot. Furthermore, Wilson contends that he did not represent Perez, personally, beyond the Fifth Circuit decision. Simply stated, the record contradicts Wilson's position. The record and exhibits indicate that Wilson continued to give Perez legal advice regarding options discussed in the March 7, 1991, conference call, and legal advice regarding the bankruptcy proceedings and the after effect of the denial of discharge after the Fifth Circuit's decision.
On February 23, 1992, Perez sent a memo to Wilson, Doug Draper, and Constance Marquerer seeking advice regarding the stay, the seizure of his furniture, jewelry, guns and other assets listed on his bankruptcy petition; whether his IRA was subject to seizure; and the appropriate time to transfer, sell or liquidate his assets, including his plan to sell Walter Ernst the stock in APIIIAPC. On February 24, 1992, Wilson responded to Perez's February 23rd memorandum informing Perez that the stay would end on March 7, 1992. Wilson further advised Perez that after March 7th he could transfer assets and sign the papers, which Wilson had prepared, concerning the sale of stock to Walter Ernst. Additionally, Wilson gave Perez advice regarding the furs and jewelry which came into question during the bankruptcy proceeding and instructed him as to whether certain assets, including the IRA, would be subject to seizure.
Furthermore, in March 1992, Wilson sent at least two letters to Perez. In a March 2 nd letter Wilson confirmed that the stay expired on March 7, 1992, and on March 4th Wilson addressed a letter to Mr. & Mrs. Perez advising them that Perez's guns were not exempt from seizure. On December 1, 1992, Wilson incorporated Perez, Ernst, Farnet Architects and Planners, A Professional Corporation ("PEF"). Despite Perez's allegation that PEF was incorporated for him, the Articles of Incorporation indicated that the corporation was formed for Walter Ernst. However, this Court notes with interest that although Perez was the President of PEF, he did not receive a salary. While the formation of PEF was not specifically discussed in the March 7th conference call, the plan for Perez to be named President of a new corporation and to not receive a salary was. We find the incorporation of PEF, with Perez named as a non-salaried President, strikingly similar to, if not wholly consistent with, the *829 plans discussed in the March 7, 1991, conference call.
On August 14, 1992, Wilson wrote to Lloyd Shields regarding a suit filed against Perez Associates Architects. Wilson noted that he represented Perez and certain of his active corporations. He informed Mr. Shields that Perez Associates, A.P.C. was changed to Associates Architect, A.P.C. and that Associates Architects was placed in Chapter 7 bankruptcy which was believed to be closed, and therefore, the corporation was now defunct. Wilson expressed that he did not intend to file an answer.
On October 14, 1992, Wilson wrote to Perez to inform him that the bankruptcy trustee disclaimed and abandoned 20 shares of Bank of Louisiana common stock and his royalty interests in Delta Queen and Last Line, therefore Perez could retain the stock and keep the royalties. Further, Wilson advised Perez that he may want to give the stock and assign the royalties to his children.
On March 26, 1993, Wilson wrote a letter to Mr. & Mrs. Perez in which he gave his opinion supported by law regarding a tax refund dispute between Cheryl and the trustee of Perez's bankruptcy estate. Wilson argued that he represented Mrs. Perez and not Mr. Perez and presented a bill in which Mrs. Perez was billed for services regarding this matter. The March 7th conference call reflects that it was part of the plan for Mrs. Perez to pay Mr. Perez's legal expenses, thus it was not unusual that Mrs. Perez was invoiced. Furthermore, Mr. Perez alleged that Wilson was representing him in this matter, and that he had a lot of interest in tax refund issues. Perez testified that:
The tax refunds were well over $550,000. It was a major item. I was concerned, one, my creditors themselves. Number two is I was concerned about my wife's personal assets. And because now she was my sole care and source. I was very concerned about the Federal Government itself. Because there was claims (sic) and cross claims between all the parties. And the attorney for the trustee was this much involved, and made, actually what he was trying to do is take all of the taxes, and even going back, way back and grabbing more taxes back. He was trying to get really involved. It became a big, major item. It was very important to me to get the people, to get that problem resolved. And I, in fact, asked Mr. Wilson to make a special effort to go in there and work with that and see that was done (sic) properly, and also make sure the taxes were paid. That there was any tax issue where we owed taxes, I wanted to make sure it was paid out of those taxes.
In April of 1993, Hibernia National Bank filed a petition of garnishment against PEF. On or about April 29, 1993, Wilson answered the garnishment interrogatories. Hibernia filed a rule to traverse answers to the interrogatories and depositions were set for August 6, 1993. On June 2, 1993, Wilson addressed a letter to Hibernia regarding the deposition of Perez informing Hibernia that "my client [Perez] has a problem with coming to the bank for his deposition." Wilson alleged that he was representing PEF and he referred to Perez as his client in the sense that he was representing any corporation and any officer or employee of that corporation that was asked to be deposed. We find this argument unpersuasive for the same reasons we found the formation of PEF consistent with Perez's post bankruptcy plans. Moreover, the issue of post bankruptcy garnishments and the plan as to how to handle it was addressed in the March 7, 1991, conference call.
On June 10, 1993, Wilson wrote a letter to Perez in which he discussed and forwarded a Louisiana case which, as Wilson stated, was the only Louisiana case that he could find "on the question of whether a person can work for no compensation and be exempt from garnishment."
On August 3, 1993, Perez, addressed two separate letters to Wilson. In one letter Perez wrote, "[t]his is to inform you that I want you to continue to represent me and my personal interests in the case regarding the garnishment interrogatories...." The second letter informed Wilson "that the stockholders, officers and directors of Perez Ernst Farnet Architects and Planners, APC have decided that the firm will retain its own counsel to represent it and their best interests *830 in the case regarding the garnishment interrogatories...." On August 11, 1993, Wilson wrote to Perez stating that:
[a]nticipating that we would be representing PEF and you at the hearing to traverse interrogatories, Tony LeMon wrote the enclosed memo which he faxed to me while I was on vacation in California. We had planned to incorporate this memo into a brief to the court when you advised that we were being replaced by other counsel. Since the work has already been done pursuant to my instructions and your urging when we got the message, you should have a copy for whatever use it might be to you, PEF, and new counsel...... Please advise what role, if any, you would like for me to play in this case.
(Emphasis added.)
Finally, in a letter dated September 2, 1993, Perez informed Wilson that he wished to sever and terminate all legal representation by Wilson and his firm. The district court correctly interpreted the continuous representation rule in accordance with Braud by restricting the operative scope of Wilson's representation to "the specific subject matter in which the alleged wrongful act or omission occurred." See Braud, 576 So.2d at 468. Under a literal reading of Braud, the "specific subject matter" at issue here would appear to be the bankruptcy proceeding. It would then stand to reason that when the bankruptcy matter concluded with the Fifth Circuit decision in February 1992, the bankruptcy representation effectively ended. Pursuant to this line of reasoning, the legal services performed by Wilson subsequent to the Fifth Circuit's February 1992 opinion would be de facto incident more to a general professional relationship.
We cannot however, interpret the continuous representation doctrine, or any other legal question for that matter, solely in the academic abstract, but in the full context of real world considerations. A limited interpretation as suggested by the district court would clearly ignore the well founded remedial purpose of the doctrine, as delineated in Lima, in permitting attorneys time in which to correct their malpractice.[5] Thus, we find that the broader interpretation of the continuous representation doctrine under Lima, discussed supra, is appropriate.
We are persuaded in the case sub judice by the Lima court's interpretation that the continuous representation doctrine is applicable where the professional's involvement after the alleged malpractice is for the same or related services and not merely continuity of a general professional relationship; and where an ongoing, continuous, developing and dependent relationship (involving advice or service) between the client and attorney exist, with the latter seeking to rectify an alleged act of malpractice. Lima, 595 So.2d at 630. Emphasis added. The attorney in Lima took acts, including admitting his malpractice, hiring and paying for counsel for the plaintiffs, and discussing steps to attempt to clear title to the property, all for the purpose of remedying his breach of his professional duty in an Act of Exchange. However, we do not think that the continuous representation rule requires that an attorney go to such lengths as an admission of malpractice, or paying for counsel, to warrant relief for a plaintiff under the continuous representation doctrine.
Although Wilson took no steps to further pursue Perez's efforts at Chapter 7 relief beyond the Fifth Circuit, Wilson's work on behalf of Perez including legal advice on matters related to bankruptcy, financial issues, garnishments, and various legal strategies were related to remedying the impact of the bankruptcy proceedings on Perez and his associated entities. Thus, we hold that what the learned district court referred to as the "general professional relationship" after the Fifth Circuit's ruling was actually part of or related to the efforts by Wilson to remedy the impact of Perez's denial of discharge in bankruptcy.
Accordingly, the trial court's finding that the continuous representation doctrine did *831 not toll the one-year prescriptive period is reversed.
However, we fully adopt the reasoning of the district court regarding the involvement of Douglas Draper and Margaret Shook (Gravolet) and find that any claims against them arising out of the work they performed for Mr. Perez have clearly prescribed.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
NOTES
[1] The firm changed its name to Friend, Wilson & Draper, and then to Friend, Wilson Draper, Hubbard & Bowling.
[2] Art. 3492: Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury of damage is sustained. It does not run against minors or interdicts in actions involving permanent disability and brought pursuant to the Louisiana Products Liability Act or state law governing product liability actions in effect at the time of the injury of damage.
[3] Perez appealed to the U.S. District Court for the Eastern District of Louisiana. The District Court affirmed. Perez then sought relief in the U.S. Fifth Circuit, where the District Court was also affirmed.
[4] Perez moved to Denver shortly after the bankruptcy and hired Nick Palmer as his attorney. However termination of an attorney client relationship is not synonymous with a change of counsel. Lima at 630. Thus, the hiring of Nick Palmer or any other attorney did not terminate the attorney client relationship between Wilson and Perez.
[5] We find it important to note that our ruling in this case in no way speaks to the issue of whether Wilson acted in any way below the standard of care in representing Perez, or whether his acts were the cause of any harm to Perez.